DICK DeWAYNE COX, JR., *et al.*, Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. DOCTOR'S ASSOCIATES, INC., Defendant and Counterplaintiff-Appellee and Cross-Appellant.

Fifth District   No. 5—91—0657

Opinion filed May 14, 1993.

Robert L. Carter, of Reinert, Duree & Crane, P.C., of St. Louis, Missouri (David M. Duree, of counsel), for appellants.

Theodore J. MacDonald, Jr., of Burroughs, Simpson, Hepler, Broom & MacDonald, of Edwardsville (Jack H. Humes, Jr., of counsel), and Alan G. Gerson and Kay A. Sherman, both of Blumenfeld, Kaplan, Sandweiss, Marx, Ponfil & Kaskowitz, P.C., of St. Louis, Missouri, for appellee.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

Doctor's Associates, Inc. (Doctor's Associates), a Connecticut corporation, sells franchises to operate Subway sandwich shops, which are retail establishments devoted to the preparation and sale of foot-long sandwiches and variations thereof.

Dick Dewayne Cox, his father Dick Cox, and Richard Yates formed Substantial Enterprises, Inc., an Illinois corporation (Substantial), in June of 1987. (Dick Dewayne Cox's father was not actively involved in Substantial or in the proceedings below, and he is not a subject of this appeal.) The men purchased six Subway franchises from Doctor's Associates and allegedly assigned all rights and liabilities to the franchises to Substantial Enterprises, Inc. Richard Yates sold two franchises which he had previously purchased from Doctor's Associates to Substantial. During 1987 and 1988, Substantial operated five Subway sandwich shops, three in St. Clair County and two in Madison County.

In 1987 Dick Cox and Richard Yates requested Doctor's Associates' approval to open Subway shops in the Mid Rivers Mall in St. Charles County, Missouri, and in the Alton Square Mall in Alton, Illinois. Cox and Yates wanted to open a Subway shop in the St. Clair Square Mall in Fairview Heights, but they were told by mall representatives that they first had to lease space at the Mid Rivers and Alton Square Malls. Cox and Yates believed that if shops at the Mid Rivers Mall and the Alton Square Mall proved successful they would be allowed to open a shop in the St. Clair Square Mall. A dispute between the parties arose over whether or not Doctor's Associates approved of plaintiffs opening shops at these three locations.

Cox testified that he and Yates sent a letter to Ted Parent, a leasing representative for Doctor's Associates, regarding the three-mall plan. Next, Hossein Naemi, Doctor's Associates' development agent, advised Cox and Yates that Ted Parent approved of the three-mall plan. Naemi suggested, however, that Cox and Yates buy Kelly Clapp's Subway store, which was located one-fourth mile from the Mid Rivers Mall. Cox testified that at no time was he advised that Doctor's Associates was conditioning the approval of his opening a Subway in the mall on his purchase of Clapp's store. Cox testified that he did not purchase Clapp's store because Kelly Clapp rejected his offer to purchase it for $45,000. Soon thereafter, Hossein advised Cox that he would not approve a Subway location in Mid Rivers Mall because he feared Kelly Clapp would sue him. Notwithstanding Naemi's advice, Cox and Yates leased space in the Mid Rivers and Alton Square Malls, and opened sandwich shops at those locations under the name SubCity. Cox told Hossein it was Doctor's Associates' fault that they had to open the SubCity stores, but that he was willing to convert them to Subway stores. From June 1988 through September 1988, Cox wrote five letters to Doctor's Associates advising the corporation that he considered Doctor's Associates to be in breach of the existing franchise agreements because (1) Doctor's Associates approved of the three-mall plan and later reneged, and (2) Doctor's Associates had refused to approve locations for three Subway stores located in Granite City, Belleville, and Troy, Illinois. Cox testified that, after notifying Doctor's Associates, he ceased paying royalty and advertising payments in accordance with his rights under section 10n of the franchise agreement, which provides:

"In the event that the Company defaults in the performance of any term or condition of the Agreement, the Franchisee shall give the Company, *** written notice within ninety (90) days of the occurrence of the default and shall specify therein the acts or omissions constituting the default. If the Company fails to cure the default within sixty (60) days after receipt of the notice, the Franchisee's obligation to make Royalty payments thereafter shall cease until the default is cured by the Company. Any default by the Company that occurred more than ninety (90) days prior to written notice thereof shall be deemed waived by the Franchisee."

Cox further testified that Leonard Axelrod, vice-president and chief legal officer of Doctor's Associates, contacted Cox and told him that opening the SubCity stores would jeopardize Subway and

was a breach of the franchise agreements. Cox testified that Axelrod told him that Doctor's Associates would not sell any more franchises to him, and also that it would not let him use the three franchises he had already paid for but was not using. Cox testified that Axelrod also told him that in order to make amends Cox would have to pay Doctor's Associates $7,500 plus 8% of the royalties received from the SubCity stores since opening, change the SubCity stores to Subways, and purchase Kelly Clapp's store. Axelrod told Cox that if these conditions were not met, Cox would be evicted from his Subway stores, and he would be forced into bankruptcy.

Witnesses testifying on behalf of Doctor's Associates disagreed with much of Cox's testimony. Ted Parent, a leasing representative for Doctor's Associates, testified that when he first learned of the Cox-and-Yates plan to open Subway stores in the three malls, he spoke with the development agent, Naemi. Parent testified that Naemi was surprised Cox had sent Parent information regarding the Mid Rivers Mall and Alton Square Mall sites. Parent had some problems with the Alton Square lease, but he testified that those problems could have been resolved through negotiation. Parent did not approve of the Mid Rivers Mall site because of Naemi's disapproval of the site. Negotiations regarding the Alton Square lease were never entered into. Parent testified that at no time did Naemi approve of the Mid Rivers Mall location. Ted Parent also testified that, after the dispute arose over Mid Rivers Mall, Doctor's Associates received an application for a lease from Cox to open a Subway in Granite City, Illinois. The lease was approved by him and was sent to Doctor's Associates' legal department for execution. Parent testified that he was not involved in the decision not to execute the Granite City lease.

Leonard Axelrod denied Cox's allegations that Axelrod threatened Cox with ultimatums. Axelrod testified: "[T]here was never a decision made to terminate the franchises, to get him out of the system." Axelrod continued: "We had a number of discussions and I am sure I wrote him a letter by that time asking him for the $7,500 and the 8% according to the Franchise Agreement which said that he has got to pay that if he violates the noncompete clause and waiting for a resolution to the problem."

Plaintiffs filed a lawsuit against defendant on June 17, 1988, and about November 1988 plaintiffs ceased paying franchise royalties and advertising fees. Sometime after suit was filed, Cox and Substantial acquired Yates' interest in the six Subway shops. Since

that time Yates has had no involvement in the five Subway shops or in SubCity, and he is not a party to this appeal.

The case proceeded to a jury trial on plaintiffs' five-count complaint alleging:

(1) breach of contract in that (a) defendant approved of site locations at the Alton Square, St. Clair Square, and Mid Rivers Malls, and at additional sites at Troy, Granite City, and Belleville, then without cause or justification withdrew approval, and (b) defendant refused to sell plaintiffs additional franchises and terminated plaintiffs' right to use their three nonoperating franchises;

(2) willful and wanton breach of contract in that defendant made false representations to plaintiffs before plaintiffs purchased their franchises, with the intention of inducing plaintiffs to purchase the franchises and enter into franchise agreements when they knew said representations to be false;

(3) Illinois Franchise Disclosure Act of 1987 (Ill. Rev. Stat. 1987, ch. 121½, par. 1701 *et seq.*) violations as to representations made by Doctor's Associates regarding (a) the number of franchises defendant would sell to an individual franchisee, (b) territorial restrictions on franchisees, (c) termination of franchises, (d) the venue selection clause in the franchise agreements, and (e) Doctor's Associates' right to give approval for a Subway location only to withdraw approval at a later time;

(4) fraud in that Doctor's Associates misrepresented the following material facts: (a) that plaintiffs could consummate a deal with the mall representatives, (b) that Doctor's Associates would not grant territorial rights, (c) that defendant would not unreasonably withhold its approval, (d) that a franchisee could purchase unlimited franchises, (e) that plaintiffs could locate stores in the three malls, (f) that plaintiffs could open stores in Granite City, Troy, and Belleville, and (g) that defendant would act in good faith; and

(5) tortious interference with a contract in that Doctor's Associates wrongfully withdrew approval of the three mall sites even though Doctor's Associates knew plaintiffs had consummated a deal with mall representatives as to those sites.

The jury also decided the fate of defendant's counterclaims for trademark infringement and for reimbursement for unpaid royalties and advertising fees. Doctor's Associates' counterclaim for injunc-

tive relief was severed at the close of the evidence. The jury awarded Substantial $200,000 in actual damages and $1 million in punitive damages. The jury returned a verdict for Doctor's Associates on its counterclaim for unpaid royalties and advertising fees in the sum of $258,060. The jury returned a verdict for Doctor's Associates on its claim of trademark infringement in the sum of $50,000.

The trial court entered judgment on the verdicts in the total sum of $1,200,000 with interest in favor of Substantial and against Doctor's Associates, and in the sum of $308,060 in favor of Doctor's Associates and against Substantial and Cox. The court also granted Doctor's Associates' post-trial motion for a permanent injunction to enjoin Substantial and Cox from using the trademark Subway. All parties appeal.

Cox and Substantial raise the following issues on appeal: (1) whether the trial court erred in not directing a verdict and in not granting a judgment notwithstanding the verdict on Doctor's Associates' counterclaims; and (2) whether the trial court erred by entering a permanent injunction in favor of Doctor's Associates. Plaintiff first asserts one theory which underlies both of the issues. That is, whether the trial court erred in permitting the defendant to prosecute its counterclaims where defendant deliberately and intentionally refused to register as a foreign corporation within Illinois. Plaintiffs argue that section 13.70 of the Business Corporation Act of 1983 (805 ILCS 5/13.70 (West 1992)) and public policy demand that defendant suffer the consequences of its refusal to register as a foreign corporation.

Section 13.70 of the Business Corporation Act of 1983 provides:

"No foreign corporation transacting business in this State without a certificate of authority is permitted to maintain a civil action in any court of this State, until the corporation obtains a certificate of authority. ***

The failure of a foreign corporation to obtain a certificate of authority to transact business in this State does not impair the validity of any contract or act of the corporation, and does not prevent the corporation from defending any action in any court of this State.

A foreign corporation that transacts business in this State without a certificate of authority is liable to this State, for the years or parts thereof during which it transacted business in this State without a certificate of authority ***. The Attorney General shall bring proceedings to recover all amounts

due this State under this Section." 805 ILCS 5/13.70 (West 1992).

■ According to the record, Doctor's Associates did not register as a foreign corporation transacting business in this State at any time during these proceedings. However, it was not until the trial, 14 months after the counterclaims were filed, that Cox and Substantial raised the argument that Doctor's Associates could not maintain its counterclaims because it did not obtain a certificate of authority under section 13.70. The trial court rejected plaintiffs' argument:

"The Court has found that Doctor's Associates, Inc. transacts business in Illinois and it is undisputed that it has no certificate of authority. *** In the absence of any Illinois case on point, the Court believes that bringing a counterclaim such as the one here, which arises directly from the subject matter of plaintiff's cause of action, should not be barred by the statute.

*** The defense that counterplaintiff failed to obtain a certificate of authority was waived by the counter-defendants' failure to raise that objection at the earliest opportunity. *Amerco Field Office v. Onoforio*, 22 Ill. App. 3d 989 (1974)."

We affirm the decision of the trial court on this point.

As for the trial court's finding that the counterclaim arose directly from the subject matter of plaintiffs' cause of action, we begin by examining the language of section 13.70. That section specifically provides that the "failure of a foreign corporation to obtain a certificate of authority *** does not prevent the corporation from defending any action in any court of this State." Section 13.70 distinguishes the right to assert a defense from the right to defend. In *McLaughlin v. Rainville Co.* (1974), 22 Ill. App. 3d 128, 316 N.E.2d 819, the court concluded that the defendant foreign corporation could not have initiated a cause of action in Illinois. However, because defendant was impleaded in plaintiff's action, defendant could assert its claim that it was entitled to the impleaded funds, even though defendant had conducted business in the State without a certificate of authority to do so.

*McLaughlin* did not deal with the issue of waiver, and our research reveals scant case law on the issue. However, at least one case, *Elsberry Equipment Co. v. Short* (1965), 63 Ill. App. 2d 336, 211 N.E.2d 463, provides that the issue of failure to register as a foreign corporation can be raised at any time. To the extent that the trial court ruled that plaintiff waived its position by not raising

it until 14 months after the counterclaims were filed, and over one week after trial had begun, we cannot conclude that such a ruling was an abuse of discretion.

■ Cox and Substantial next argue that the trial court erred in granting Doctor's Associates a permanent injunction, because Doctor's Associates has unclean hands. Plaintiffs contend that bad faith, fraudulent misrepresentation, and willful and wanton breach of the franchise contracts by Doctor's Associates were established by the jury's verdict finding that Doctor's Associates breached the franchise agreements and that such a finding precludes Doctor's Associates from either enforcing the franchise agreements or from obtaining injunctive relief.

The parties agree that unclean hands is a defense to a Lanham Act (15 U.S.C. §1051 *et seq.* (1986)) infringement suit. (*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.* (9th Cir. 1987), 826 F.2d 837, 847.) One who comes into equity must come with clean hands, or as otherwise stated, one seeking equitable relief cannot take advantage of his own wrong. (*Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.* (1984), 128 Ill. App. 3d 763, 768, 471 N.E.2d 554, 558.) Before it is necessary to determine whether a party seeking an injunction has clean hands, however, there must be a demonstration that the conduct of the party seeking the injunction "relates to the subject matter of its claims." (*Fuddruckers*, 826 F.2d at 847; *Fair Automotive*, 128 Ill. App. 3d at 768, 471 N.E.2d at 558.) In the case at bar, the activities plaintiffs complain constitute Doctor's Associates' unclean hands are activities arising from Doctor's Associates' performance under the franchise agreements, conduct which is unrelated to Doctor's Associates' claims of trademark infringement. We, therefore, find plaintiff's argument to be without merit.

. Cox and Substantial further argue that the trial court erred in granting the permanent injunction without applying the doctrine of equitable recoupment to permit plaintiffs to recover their investment in the eight purchased franchises.

Prior to trial, Doctor's Associates filed a counterclaim in which it asserted, among other things, claims for breach of the franchise agreements and injunctive relief on grounds of unfair competition and trademark infringement under the Lanham Act (15 U.S.C. §1051 *et seq.* (1986)). On the breach-of-franchise-agreements claim, Doctor's Associates prayed that the court award Doctor's Associates $236,016 for royalty and advertising fees, plus $15,000 for opening competing sandwich-shop businesses. On the claims for injunctive relief, Doctor's Associates prayed for the court to enjoin

the plaintiffs from continuing to operate plaintiffs' five existing Subway shops and to cease from infringing on the Subway trademark. Doctor's Associates also requested that the court award actual and punitive damages against plaintiffs for the injuries suffered by reason of plaintiffs' conduct, and it requested the attorney fees incurred in pursuing collection of the withheld royalty and advertising fees. Plaintiffs' responsive pleadings to defendant's counterclaim did not raise the issue of equitable recoupment, nor did plaintiffs ask that they be awarded the amount of their investment in the five existing franchises or that they be permitted to recoup the amounts invested in the five stores prior to an injunction being imposed against them.

At the jury-instruction conference at the close of the evidence, the court inquired of counsel for Doctor's Associates whether the issue of trademark infringement, for which Doctor's Associates sought an injunction, should be decided by the jury. Plaintiffs' counsel argued that a request for equitable relief could not be submitted to the jury. Attorneys for Doctor's Associates noted that its counterclaim for violation of trademark infringement under the Lanham Act sought recovery of actual and punitive damages and would not be an action in equity. The trial court agreed and ruled that the jury could

> "go ahead and consider the complaint and the counterclaim as the counterclaim pertains to damages for misuse or violation of the defendant's trademark rights and the patent rights, if those claimed monetary damages, those are jury issues, factually to be decided by the jury, but the Court reserves of course to itself the resolution of the equitable relief prayed by way of injunction."

Doctor's Associates' counterclaim for injunctive relief was severed from the damage claims at that time.

The case was submitted to the jury on the claims and counterclaims for damages. On the claim of trademark infringement, the jury was instructed to determine the amount of damages to be awarded, if any, on Doctor's Associates' loss of goodwill, injury to business reputation, and diminishment in value of the trademark. The jury returned a verdict in favor of Doctor's Associates on its counterclaim of trademark infringement and awarded damages in the amount of $50,000. Doctor's Associates was also awarded $258,060 on its counterclaim for past-due royalties and advertising fees.

After trial, Doctor's Associates filed its motion for permanent injunction for trademark infringement. Cox and Substantial filed a motion for judgment notwithstanding the verdict which for the first time alleged the theory of equitable recoupment. Plaintiff's motion for judgment notwithstanding the verdict provided in pertinent part:

> "Counter-Defendants are entitled to the continuous use of the tradename 'Subway' at their 5 existing stores, following the alleged termination of those 5 franchises by Doctor's Associates, Inc., until Counter-Defendants recover the amount of their investment, which has not yet occurred, and therefore, as a matter of law, Counter-Plaintiff Doctor's Associates, Inc. is not entitled to a judgment for alleged trademark infringement, and the $50,000 counterclaim award should be set aside and judgment entered for Counter-Defendants on that issue, and further, in the alternative, for the same reason Counter-Defendants are entitled to use of the tradename after the alleged termination of the 5 franchise agreements for the 5 operating stores until Counter-Defendants recover their investment, which has not yet occurred, and therefore, as a matter of law, Counter-Plaintiff should not be entitled to recover alleged past due royalties and advertising fees, and the counterclaim verdict of $258,060.00 should be set aside as a matter of law."

At the hearing on the post-trial motions, the court granted plaintiffs leave to amend their answer to Doctor's Associates' counterclaim to assert their claim for equitable recoupment. However, the court also indicated it did not feel that the doctrine of equitable recoupment was recognized in Illinois.

In anticipation of the court's denial of their claim, plaintiffs made an offer of proof setting forth what evidence they would present to establish how much they had invested in the five stores and how they could recoup their investment. Plaintiffs argued that they could: (1) continue to operate as a franchise indefinitely, paying the requisite royalty and advertising fees; (2) sell the five stores to *bona fide* purchasers; or (3) continue to operate as a franchisee until they recouped their investment.

The trial court granted Doctor's Associates' motion for a permanent injunction and ruled that the doctrine of equitable recoupment was not a bar to Doctor's Associates' request for injunctive relief. The court declined to grant plaintiffs' request for equitable recoupment and ruled that "although the doctrine is recognized by

federal courts, no authority has been cited for recognition of the doctrine by Illinois state courts."

■ Plaintiffs argue that the trial court erred by not applying the doctrine of equitable recoupment to permit them to recover their investment in the five franchises. We first address whether plaintiffs were diligent in raising such a claim.

Recoupment is in the nature of a cross-action in which a defendant alleges that it has been injured by a breach by plaintiff of another part of the contract on which the action is founded. (*Olin Mathieson Chemical Corp. v. J.J. Wuellner & Sons, Inc.* (1966), 72 Ill. App. 2d 488, 218 N.E.2d 823.) Section 2—608 of the Code of Civil Procedure abolishes the defense of recoupment and requires recoupment to be considered a counterclaim. (735 ILCS 5/2—608 (West 1992); *Baiocchi v. Magidson* (1967), 81 Ill. App. 2d 387, 225 N.E.2d 732.) That statute provides that a claim by a defendant against a plaintiff "whether in the nature of a set-off, recoupment, cross claim or otherwise *** may be pleaded as a cross claim in any action and when so pleaded shall be called a counterclaim." 735 ILCS 5/2—608 (West 1992).

Section 2—608 is permissive. (*Young Men's Christian Association v. Midland Architects, Inc.* (1988), 174 Ill. App. 3d 966, 971, 529 N.E.2d 288, 291.) Courts have repeatedly cited the interpretation of that statute as posed in *Miller v. Bank of Pecatonica*:

> "We are of the opinion, however, that while this statute is designed to simplify the litigation between parties by providing that all issues can be tried in one forum at the same time, it does not require a defendant to immediately assert his rights by way of counterclaim ***. The word 'may' in the quoted words of the statute indicate[s] an election is available to the defendant and the cases have so interpreted this statute." (*Miller v. Bank of Pecatonica* (1980), 83 Ill. App. 3d 424, 427, 403 N.E.2d 1262, 1264.)

(See also *Young Men's Christian Association v. Midland Architects, Inc.* (1988), 174 Ill. App. 3d 966, 529 N.E.2d 288; *Torcasso v. Standard Outdoor Sales, Inc.* (1992), 232 Ill. App. 3d 500, 597 N.E.2d 772, *appeal allowed* (1992), 147 Ill. 2d 637, 606 N.E.2d 1235.) Furthermore, courts have held that where it is convenient or strategically advisable to file a counterclaim after the trial, the claimant is not precluded from doing so. (See *Young Men's Christian Association*, 174 Ill. App. 3d 966, 529 N.E.2d 288, *Torcasso*, 232 Ill. App. 3d 500, 597 N.E.2d 772.) Although plaintiffs first

raised the claim of equitable recoupment after trial, we find that plaintiffs did not waive the right to assert their claim.

The parties have cited no Illinois cases dealing with equitable recoupment, and our research of Illinois law has uncovered scant reference to the doctrine. Some Illinois cases spoke of recoupment as a tool which could be used to promote justice, prevent litigation, and avoid the multiplicity of suits. (*Burroughs v. Clancey* (1869), 53 Ill. 30; *Peck v. Brewer* (1868), 48 Ill. 54; *Stow v. Yarwood* (1853), 14 Ill. 423.) These cases refer to recoupment as a means of setoff pled as a counter-action whether or not it arises from the underlying suit. We note that our current Code of Civil Procedure includes recoupment within its description of counterclaims (735 ILCS 5/2—608 (West 1992)). In view of the lack of Illinois authority on recoupment, we have examined authority from other jurisdictions which have applied the doctrine.

The doctrine of equitable recoupment has been held to apply when a contract, such as a franchise contract, is terminated without just cause before the franchisee has recouped its investment. (*Schultz v. Onan Corp.* (3d Cir. 1984), 737 F.2d 339, 346.) For instance, it has been held that where an exclusive franchise dealer under an implied contract, terminable on notice, has at the instance of a manufacturer or supplier invested his resources and credit in establishing a costly distribution facility for the supplier's product, and the supplier thereafter terminates the contract and dealership without giving the dealer an opportunity to recoup his investment, a claim may be stated. (*Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.* (8th Cir. 1968), 395 F.2d 388, 391.) The doctrine of recoupment is designed to remedy the inequity which arises when a manufacturer, after requiring a distributor to make a sizeable investment in the furtherance of a distributorship, terminates the working relationship without just cause and leaves the distributor with substantial unrecovered expenditures. *Ag-Chem Equipment Co. v. Hahn, Inc.* (8th Cir. 1973), 480 F.2d 482, 486.

After reviewing the authorities concerning the doctrine, we find one significant factor underlying claims for equitable recoupment; there must be a showing by the complainant that termination of the working relationship was *without just cause*. See *Ag-Chem Equipment Co. v. Hahn, Inc.* (8th Cir. 1973), 480 F.2d 482; *Schultz v. Onan Corp.* (3d Cir. 1984), 737 F.2d 339; *McGinnis Piano & Organ Co. v. Yamaha International Corp.* (8th Cir. 1973), 480 F.2d 474; *W.K.T. Distributing Co. v. Sharp Electronics Corp.* (8th Cir. 1984), 746 F.2d 1333; *Westfield Centre Service, Inc. v. Cities Service Oil*

*Co.* (1981), 86 N.J. 453, 432 A.2d 48; *Gibbs v. Bardahl Oil Co.* (Mo. 1960), 331 S.W.2d 614; *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.* (8th Cir. 1968), 395 F.2d 388; see also Hillman, *An Analysis of the Cessation of Contractual Relations*, 68 Cornell L. Rev. 617 (1983); Gellhorn, *Limitations on Contract Termination Rights— Franchise Cancellations*, 1967 Duke L.J. 465; 6 A. Corbin, Contracts §1266 (1962 & Supp. 1992); Restatement (Second) of Contracts §344 (1981).

Therefore, we examine the question of whether termination of the five Subway stores was for good cause. Section 19 of the Franchise Disclosure Act of 1987 (815 ILCS 705/19(b) (West 1992)) defines "good cause" as including "the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days." The franchise agreements, which are substantially similar to each other, provide in pertinent part:

"8. a. Provided it gives the Franchisee written notice at least ten (10) days prior thereto, the Company may, at its option and without prejudice to any of its other rights or remedies provided for hereunder, terminate this Agreement if the Franchisee fails to pay any sums of money due the Company or one of its affiliates. The written notice shall specify the default and further provide that the Franchisee has ten (10) days from the date of delivery of the notice to remedy the default.

* * *

c. Upon termination of this Agreement, all of the Franchisee's rights hereunder shall terminate. The Franchisee shall forthwith discontinue use of all trade names, trademarks ***."

It is clear that Doctor's Associates had contractual authority to terminate the franchise agreements in the event plaintiffs failed to pay royalty or advertising payments. Cox admitted that he stopped paying royalty and advertising fees on or about November 1988. The jury awarded Doctor's Associates $258,060 for unpaid royalties and advertising fees.

Doctor's Associates' request for injunctive relief was no more than a request for enforcement of its contractual right to terminate the franchise agreements. Based on the evidence presented, we cannot conclude that termination of the franchise agreements was without good cause. Because a claim for equitable recoupment be-

gins with a showing that the working relationship was terminated without just cause, we conclude that the trial court properly refused to apply the doctrine of equitable recoupment.

We now turn to the issues raised by Doctor's Associates in its cross-appeal. Doctor's Associates first contends that the trial court erred in denying its motion for directed verdict or judgment notwithstanding the verdict on count I for breach of contract because Substantial was not the proper plaintiff to maintain that cause of action. Doctor's Associates points out that in count I Substantial sought to hold Doctor's Associates liable for its alleged breach of the franchise agreements. Doctor's Associates argues that only a party to a contract may sue another for breach of that contract, and because Cox and Yates, not Substantial, entered into the franchise agreements, Substantial cannot maintain a claim for breach. Doctor's Associates argues that Cox voluntarily dismissed himself as a plaintiff during the trial and left Substantial as the sole plaintiff. Defendant contends it was never made aware of an assignment of Yates' and Cox's interests to Substantial, and that, even if said assignment was made, there is no evidence to substantiate that Cox, Yates, and Substantial complied with the assignment requirements set forth in the franchise agreements. Doctor's Associates argues that Cox erred in voluntarily dismissing himself from count I because Substantial was not the proper party-plaintiff and, therefore, the verdict as to count I should be reversed.

Plaintiffs point out that at the conclusion of the evidence it was Doctor's Associates who suggested that Substantial be dismissed as a party-plaintiff. Counsel for plaintiffs replied that he would not dismiss either Cox or Substantial as a plaintiff because he did not want to be accused of dismissing the wrong party. Plaintiff's counsel maintained: "Our position [is] that both of them are and if they want to take a position one is correct and one incorrect one [sic], they can take that position but I am not going to dismiss one or the other and have them arguing you dismissed the wrong one. They will have to make the motion." The trial court found that there was "an assignment, the legal sufficiency of which has never seriously been challenged." After further argument by both parties, but without an acknowledgment by plaintiff's counsel that it was the proper course to take, the court ruled that the proper plaintiff was Substantial and that Cox was to remain in as a counterdefendant only.

■ We cannot find that the determination of the trial court was in error. Plaintiffs argue that defendant was aware of the assignment of Cox' and Yates' interests in the franchises to Substantial.

We note that the initial franchise agreements permit the franchisee to assign his rights under the agreement to a corporation. The franchise agreements, while specifying certain restrictions on the assignment of such interests, do not require notification of Doctor's Associates. In addition, while Cox acknowleged that the franchise agreements were signed by Cox and Yates personally, he testified that all checks written to Doctor's Associates or Subway were drawn on Substantial's checking account. Cox testified that both he and Yates executed an assignment which transferred their interests in the franchises to Substantial, and an assignment executed by Richard Yates conferring his interest in the franchises and leases to Substantial was admitted into evidence.

A court of review will not substitute its opinion and disturb the findings of the trial court unless the decision of the trial court is manifestly against the weight of the evidence. (*Herst v. Chark* (1991), 219 Ill. App. 3d 690, 579 N.E.2d 990.) We have reviewed the record in its entirety. Given the evidence that notice of an assignment to Doctor's Associates was not required under the franchise agreements, that all royalty and advertising fee payments to Doctor's Associates were drawn on Substantial's account, and that Doctor's Associates had reason to believe Substantial was the assignee of Cox's and Yates' interests in the franchises yet took no action to contest the assignment, we cannot find that the trial court's finding that Substantial was the proper party-plaintiff was erroneous.

Doctor's Associates also raises several evidentiary issues for our review. First, Doctor's Associates argues that the trial court erred in admitting evidence relating to other eviction lawsuits filed by Doctor's Associates. Doctor's Associates moved *in limine* to prevent plaintiffs from questioning Leonard Axelrod about a lawsuit between Doctor's Associates and a California franchisee. Plaintiffs' counsel argued that he would only need to refer to the California lawsuit if Axelrod's testimony about the purpose behind the required sublease arrangement differed from the testimony he gave in the California action. The court denied defendant's motion *in limine*.

■ Plaintiffs argue that the testimony as to the witnesses' prior answers to the same questions involving Doctor's Associates' business practices and policies as to evictions was relevant because in the instant case Doctor's Associates represented in its franchise-offering circular that it would use good faith in resolving disputes with its franchisees before instituting an eviction action. Plaintiffs' counsel used the California transcript to examine Axelrod about

Doctor's Associates' business practices with regard to its use of the sublease arrangement and eviction lawsuits. Defendants argue that plaintiffs questioned Axelrod extensively about evictions of other franchisees. Our review of the record demonstrates that the only reference to any other lawsuit was the reference to the California case to establish that Axelrod had previously testified about the business practices of Doctor's Associates in dealing with its franchisees. Specific eviction lawsuits concerning other franchisees were not brought out during Axelrod's examination.

A reviewing court will not reverse a trial court's ruling on a motion *in limine* unless the court abused its discretion. (*People v. Williams* (1978), 60 Ill. App. 3d 529, 532, 377 N.E.2d 367, 370; *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 359 N.E.2d 752.) Contrary to defendant's assertion, we do not find that the admission of the evidence was irrelevant or prejudicial, nor do we find that the trial court abused its discretion in denying the motion *in limine*.

A second evidentiary issue presented for review is the trial court's admission of evidence as to Doctor's Associates' corporate and franchisor status in Illinois. Defendants moved *in limine* to exclude any reference to its not being registered as a foreign corporation in Illinois. The court allowed the motion *in limine* under the condition that plaintiffs would be permitted to present such evidence if they could demonstrate that evidence of lack of registry was relevant to the issues in this lawsuit. Doctor's Associates' technical violations of the Illinois franchise registration laws were brought out during examination of Leonard Axelrod and Hossein Naemi. Defendants argue that this evidence was irrelevant and inflamatory and admitted solely to poison the minds of the jury against Doctor's Associates, and that the evidence contributed to the award of punitive damages.

Plaintiffs tried to get Axelrod to admit that Doctor's Associates violated the Illinois franchise disclosure law by not registering as a foreign corporation licensed to do business in this State. Axelrod, while not admitting or denying that Doctor's Associates was a registered foreign corporation licensed to do business in Illinois, explained that Doctor's Associates believed that it was not required to register with the Secretary of State:

"Doctor's Associates does not own any property or lease any property or have any employees in the State of Illinois and as a consequence is not required to register as a foreign corporation. All it does is sell franchises into the State of Illinois.

\* \* \*

\*\*\* [T]he way we understand it is that Doctor's Associates by merely selling franchises into the State of Illinois or any state is not required to register as a foreign corporation.

\* \* \*

\*\*\* [I]t does not have any property here that connects it, doesn't do both things where it's required under the Interstate Commerce Act to register as a foreign corporation in the State of Illinois so that it would then have to pay taxes and file taxes, stuff like that, in Illinois. It pays its taxes in Connecticut.

\* \* \*

That's correct, but since it doesn't do those acts which require it to register in the State of Illinois as a foreign corporation and specifically one of the reasons was for setting up that leasing corporation to do this was so that it wouldn't have both of those facets, where it would be required to register \*\*\*."

With regard to plaintiffs' counsel's questions as to whether development agent Naemi was at one point in 1987, 1988, or 1989 unlicensed and, therefore, unlawfully selling franchises in Illinois, Axelrod testified: "Oh, no. He did not sell any franchises in Illinois until he was legally qualified to do so." Axelrod agreed that in order for Naemi to act as a development agent and sell franchises he would have to be registered with the State of Illinois. Axelrod testified that although one of the duties of a development agent is to sell franchises, sometimes they do not sell franchises. He testified that even though Naemi was the development agent during a period of time when he was not licensed to sell franchises, Doctor's Associates was still lawfully able to sell franchises in Illinois.

As illustrated in the following colloquy, plaintiffs' counsel inquired as to whether Doctor's Associates was lawfully selling franchises in Illinois at the time the plaintiffs purchased their franchises:

"Q. One of the job duties of a development agent is to sell franchises?

A. That's correct, but sometimes they don't sell franchises.

Q. All right. And if Mr. Naemi wasn't the development agent for this area in southern Illinois in 1987 and 1988, nobody was; is that right?

A. Oh, no. I can see you are confusing that. Franchises get sold and can get sold very easily through the company main office. It gets sold through Fertman (phonetic), Foleo, whoever was registered with the State of Illinois at the time, and that's how they get sold. I mean, you are confusing. You believe that only development agents can sell a franchise in the State of Illinois and that's just untrue. We have people within the organization that are qualified and licensed annually, continually, to sell franchises and that's what probably happened.

Q. State of Illinois says for you to be involved in any way—.

A. He is not involved in those sales, because the way they get sold is they get sold through the person who is qualified and we qualify people within the home office including Fred DeLuca.

Q. The State of Illinois says to be involved in the sale of a franchise in any way—.

A. So what? It doesn't mean that he was selling those franchises. Those sales were coming through a person who was qualified to sell them. He wasn't issuing any brochures. What he was doing was referring them back to the home office to do the sale.

* * *

Q. Mr. DeLuca is a registered dealer in the State of Illinois because he has some remote involvement in the sale of franchises so he has to be a registered dealer?

A. No, sir, that's not the reason we register him as dealer. We register him as a dealer because there are occasions when he may have a conversation with somebody to sell them, that would involve him in the sale of a franchise. Just be very, very safe. However, what we do is we register our people at the home office, and that's where the sales take place."

Hossein Naemi was also questioned regarding alleged violations of the Illinois franchise registration laws. He testified that from approximately November 1987 through July of 1988, for some reason unknown to him, Subway could not sell franchises in Illinois. He testified that as far as he knew no franchises were sold in Illinois during that time.

Emphasis on a defendant's corporate nature is improper because it tends to distract the jury from the real issue in the case and tends to evoke prejudice the jury might harbor against corpora-

tions generally. (*Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 404 N.E.2d 265.) However, a reference to corporate and franchisor status need not require that a verdict be set aside if it appears no actual prejudice resulted. (See *Ruffiner v. Material Service Corp.* (1985), 134 Ill. App. 3d 747, 758, 480 N.E.2d 1157, 1165, *rev'd on other grounds* (1987), 116 Ill. 2d 53, 506 N.E.2d 581; *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.* (1991), 224 Ill. App. 3d 559, 586 N.E.2d 600, *appeal allowed* (1992), 144 Ill. 2d 632, 591 N.E.2d 20.) A court of review looks not at whether an error-free trial occurred, but whether error occurred which prejudiced the appellant or unduly affected the outcome. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 139, 254 N.E.2d 453, 457.) We do not believe that the references at bar rose to the level of reversible error.

■ While plaintiffs' counsel apparently attempted to draw testimony from the witnesses that Doctor's Associates violated the Illinois franchise laws, it is equally apparent that the witnesses were given much latitude in testifying that plaintiffs were wrong in their assumption and that Doctor's Associates believed that it did not violate any law. As for specific inquiries by plaintiffs' counsel as to why Naemi waited to become a licensed broker and whether Doctor's Associates would have to pay Illinois franchise taxes if it was wrong about not having to register as a foreign corporation in this State, the court sustained defendant's objections to these questions. In addition, the trial court instructed the jury that a corporation deserves the same fair treatment as an individual. The trial judge was in a better position to assess prejudicial impact upon the jury (see *Ruffiner*, 134 Ill. App. 3d at 759, 480 N.E.2d at 1165), and he denied defendant's post-trial motion which included an allegation of prejudicial error based on these references.

The next issue raised by defendant is whether the trial court erred in admitting evidence of the earnings of the two sole shareholders of Doctor's Associates, Fred DeLuca and Peter Buck.

At trial evidence was presented that the net worth of the corporation was $7 million as of April 1991. In addition, the following statement was read into evidence:

> "Doctor's Associates, Inc. has a corporate structure which is perfectly legal, which pays the net annual income of the corporation to the two shareholders of that corporation in equal shares. The amount of compensation paid to Mr. Frederick DeLuca and separately to Mr. Peter Buck for the past four years is: 1987, five million dollars a piece; 1988, ten mil-

lion dollars a piece; 1989, sixteen million dollars a piece; 1990, twenty-seven million dollars a piece."

Defendant argues that the trial court erred in permitting evidence of net earnings rather than net worth. Defendant cites *Fopay v. Noveroske* (1975), 31 Ill. App. 3d 182, 334 N.E.2d 79, in support of its argument.

■■ Traditionally, courts have used net worth to measure a defendant's wealth, net worth being defined as the aggregate of the equities representing proprietary interests; the excess of the going-concern value of assets over liabilities to outsiders. (*Fopay*, 31 Ill. App. 3d at 200.) In *Fopay*, the court held that evidence of net earnings was not admissible on the issue of punitive damages because earnings were intertwined with net worth. In the instant case, evidence was presented that in closely held businesses, such as Doctor's Associates, the shareholders are free to take out whatever salary they choose, leaving whatever net worth in the corporation that they desire. Under the circumstances of this case, we do not find the decision of the trial court to be inconsistent with the holding in *Fopay*.

Another evidentiary issue on appeal is whether the trial court erred in permitting parol evidence to vary the terms of the franchise agreements. Doctor's Associates contends that the trial court improperly allowed parol evidence on two occasions. In particular, defendant maintains that plaintiffs were permitted to testify that oral promises were made that (1) plaintiffs could open as many franchises as they wanted, and (2) space within a regional mall was a separate market from the surrounding area. Defendant asserts that neither of these alleged promises were set forth in any written agreement, and that this erroneous parol evidence operated to vary the terms of the franchise agreements, thus lending credence to the jury finding that defendant breached the contracts.

■■ As for the first instance of alleged improper parol evidence, we find that plaintiffs' testimony was not inconsistent with the franchise-offering circular, the promotional brochure, or the franchise agreements. These documents provided that there are no territorial limits and that site approval for new locations would not be unreasonably withheld. The franchise-offering circular, the promotional brochure, and the franchise agreements are silent as to how many franchises a franchisee is permitted to open. Plaintiffs' testimony that space within a regional mall was a separate market from the surrounding area and that plaintiffs could open as many franchises as they wanted did not operate to vary the written terms.

Under the parol evidence rule, extrinsic evidence of a prior or contemporaneous agreement is inadmissible to vary, alter, or contradict the terms of a written instrument that is complete, unambiguous, valid, and unaffected by fraud, duress, mistake, or illegality. (*Chicago White Metal Casting, Inc. v. Treiber* (1987), 162 Ill. App. 3d 562, 517 N.E.2d 7; *Johnson v. Flueckiger* (1980), 81 Ill. App. 3d 623, 401 N.E.2d 1317.) Based on the foregoing, we cannot find that the trial court erred in allowing the plaintiffs' testimony.

The next issue on appeal is whether the trial court erred in admitting evidence from Substantial's expert witnesses because plaintiffs violated Supreme Court Rule 220 (134 Ill. 2d R. 220).

Pursuant to a pretrial discovery order, plaintiffs designated Lloyd Gordon and Robert Seiffert as their expert witnesses. The pretrial discovery order provided that the case was to be set for trial in late February 1991. Doctor's Associates deposed Seiffert on December 19 and 20, 1990. Doctor's Associates argues that it was not until January 31, 1991, that plaintiffs supplemented discovery, thereby putting defendant on notice of Seiffert's opinion regarding a 50-store model. Plaintiffs tendered Seiffert for an additional discovery deposition. Defendant objected to redeposing Seiffert on new theories but did depose him again on February 8, 1991. Defendant contends that the trial court violated Supreme Court Rule 220 (134 Ill. 2d R. 220) by allowing Seiffert to testify regarding information submitted to him after his first deposition.

■ We cannot find that the trial court erred. We note at the outset that neither deposition of Seiffert is included in the record. The record does show, however, that at a hearing before the trial court defendant admitted to having received notice at the first deposition on December 19, 1990, of Seiffert's intention to testify about a 45-store model. Defendant's claim of prejudice regarding Seiffert's testimony on the multistore model is further diluted in view of the fact that the trial court ruled that Seiffert could rely upon documents produced to Doctor's Associates before Seiffert's second discovery deposition but could not rely upon any documents produced after February 8, 1991. Supreme Court Rule 220 mandates the completion of discovery no later than 60 days prior to trial. (134 Ill. 2d R. 220; *Marshall v. Taylor-Wharton Co.* (1992), 234 Ill. App. 3d 596, 609, 599 N.E.2d 1015, 1022.) The trial began on April 15, 1991, more than 60 days after Seiffert's second discovery deposition. It appears from the record that discovery on behalf of both parties, including, but not limited to, discovery relating to Seiffert, resulted in the February trial date being moved to April

1991. It is not evident in the record, and defendant has not claimed, that the April trial date was the direct result of the extended discovery concerning witness Seiffert. Based on the circumstances, we cannot conclude that Rule 220 was violated.

Defendant further contends that Rule 220 was violated by the testimony of a leasing representative for May Centers, Paul Nagel, who testified about demographics and fast-food franchises and gave his opinion that regional shopping malls constitute a separate market. Nagel was not disclosed as an expert, and plaintiffs assert that he did not testify as an expert at trial. Plaintiffs acknowledge that Nagel gathered data about fast-food restaurants and shopping malls, but they contend that he testified solely as an occurrence witness.

A review of Nagel's testimony demonstrates that his testimony was beyond that of an occurrence witness. Nagel testified regarding data he gathered and a survey he conducted concerning shopping malls and markets for fast-food franchises in general. Nagel concluded that there is widespread recognition by the shopping mall industry that fast-food franchises may be located both inside and outside an enclosed shopping mall without infringing on each other's market. Defendant argues that the jury impermissibly heard expert testimony as to separate market areas.

The question of whether a witness must be disclosed as an expert under Rule 220 partially depends on the expert's relationship to the case. (*Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, 548.) Nondisclosure of Nagel violated Rule 220, but we conclude that the error was harmless in this case. At the most, the jury heard that it was feasible and a widely accepted practice to have the same food franchise located both inside and outside a mall. Defendant does not argue how this testimony prejudiced Doctor's Associates, and without more, we cannot find that the testimony was sufficient to constitute reversible error.

Doctor's Associates next argues that the trial court erred by allowing speculative evidence to be introduced by plaintiffs' expert Robert Seiffert. Seiffert gave his opinion of the value of Substantial's Subway stores as of the time of trial assuming Substantial had been permitted to proceed with its 50-store development plan. Defendant argues that Seiffert's testimony was improper because he told the jury of Substantial's lost earnings based upon a hypothetical model which he and the plaintiffs created. Doctor's Associates also objected to various exhibits which Seiffert created based upon his hypothetical model.

An expert may give an opinion without disclosing the facts underlying such an opinion. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) The burden is on the adverse party during cross-examination to elicit facts underlying the expert's opinion. (*Wilson*, 84 Ill. 2d at 194, 417 N.E.2d at 1326.) Defendant took advantage of the opportunity to cross-examine Seiffert as to his method of arriving at damages. Defendant also acknowledges that its own expert, Dennis Nilges, gave his opinion that plaintiffs' projected multistore plan would not have become a profitable operation.

Robert Seiffert is a certified public accountant. Plaintiffs point out, and the record substantiates, that Seiffert utilized the following factors in arriving at an opinion of total economic losses: demographic data on proposed site locations, average sales figures in fast-food restaurants for different types of locations, the actual economic history of the five stores operated by Substantial, documents from Doctor's Associates on average sales for Subway stores and related information, actual sales records of typical stores as well as the existing five stores, average expenses for fast-food restaurants at different types of locations, traffic count at proposed locations, average sales per customer at fast-food restaurants, success and failure rate of fast-food restaurants in different types of locations, and the estimated starting costs and start-up dates at each new location. Defendant's expert, Dennis Nilges, an accountant, testified that although he thought Seiffert's underlying assumptions were faulty, he would not say that Seiffert's overall methodology was. Nilges testified that changing the underlying assumptions would change the bottom-line figure on total damages. Nilges also testified that he has used methods similar to those utilized by Seiffert.

The difficulty of ascertaining damages for a particular wrong is not a reason to deny a cause of action for its redress. (*Goldberg v. Ruskin* (1986), 113 Ill. 2d 482, 490, 499 N.E.2d 406, 410.) While damages may not be predicated on mere speculation, absolute certainty concerning the amount of damages is not necessary; the evidence need only tend to show a basis for the computation of damages with a fair degree of probability. (*Amp-Rite Electric Co. v. Wheaton Sanitary District* (1991), 220 Ill. App. 3d 130, 166, 580 N.E.2d 622, 646.) We do not believe Seiffert's testimony as to damages was too speculative to have been considered.

The next issue Doctor's Associates raises is whether the trial court erred in failing to award sanctions against the plaintiffs, their counsel, and their expert, for disclosing confidential information. Defendant refers to a protective order which limited the use and

disclosure of Doctor's Associates' financial data, including income statements and statements as to gross profits and expenses, to designated experts and parties for the purpose of this litigation only. After the conclusion of the trial, Doctor's Associates learned that confidential information may have been disclosed to John Weible in violation of the protective order. Weible was a witness called by plaintiffs who is also a plaintiff in a California case against Doctor's Associates.

After defendants deposed Weible, they filed a motion for sanctions alleging in pertinent part that: (1) Weible admitted that he had obtained confidential financial information which was left in his hotel room and that this information was furnished by him to various State agencies; (2) Weible admitted that contents of the deposition of Ralph Slivka were disclosed to him notwithstanding the verbal promise of plaintiffs' counsel at Slivka's deposition to keep such information confidential prior to a ruling on the court with respect to its admissibility; and (3) Weible admitted that he had furnished information concerning Slivka's deposition to Alberto Esteva, an attorney with the California Department of Corporations, about purported disclosures made by Slivka in his deposition. The trial court denied defendant's motion for sanctions.

John Weible testified at his deposition that he was asked to testify for the plaintiffs in the instant case and that sometime prior to trial he received: a copy of plaintiffs' complaint, copies of pleadings, a copy of the proposed protective order, copies of DeLuca's deposition, Parent's deposition, and Christopher McDonald's deposition, and answers to interrogatories propounded by the defendant. When asked whether he was ever shown any financial information of Doctor's Associates, Weible testified that none of the attorneys or their representatives showed him any financial documents. Weible testified, however, that he had seen documents containing financial information which had been left in his room during the course of the trial. He testified: "[T]hey were file boxes that contained exhibits and other documents, development agent agreements and information that was being used during the course of the trial. *** I saw financial information on Mr. DeLuca. *** I saw his tax return." Weible continued:

> "At the time, I was just sitting in my room and I decided to take a look at what they had compared to what I had. And quite a bit of the information I had supplied them was marked as exhibits during the trial, and was in their file

boxes. And I was just looking at the documents. I did not copy any document. I did not take any document."
He further testified that he made no notes regarding any of the documents.

At the hearing on the motion for sanctions, counsel for the plaintiffs advised the court that John Weible had a hotel room separate from a conference room which was used to store evidence for the trial. Counsel stated that he had no knowledge that any kind of confidential information was made available or inadvertently left where Weible could have looked at it.

Regarding Slivka's deposition, which defendant asserts Weible was made privy to during a car trip, Weible was asked what was said in his presence. Weible testified that he was not told anything regarding Slivka's deposition, although he did recall overhearing that the franchisee advertising fund did not exist until about January of 1991. Weible further testified that he disseminated information to the California Department of Corporations regarding what he had learned about Doctor's Associates after Slivka's deposition was read in open court. Weible testified that he told Esteva, an attorney with the California Department of Corporations, that Weible's allegations regarding the franchise advertising fund were confirmed by the testimony of Slivka which he had heard in court.

■■■ The sanction, if any, to be imposed for failure to comply with discovery orders depends on the facts of each case and is within the trial court's discretion. The trial court's discretion in deciding whether to impose such sanctions is broad and will not be interfered with unless it appears that it has been abused. (*Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 548 N.E.2d 96; *Romano v. Bittner* (1987), 157 Ill. App. 3d 15, 510 N.E.2d 924; *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022.) The trial court decided that there was insufficient evidence to establish that plaintiffs violated the protective order. Plaintiffs denied intentionally or inadvertently leaving confidential documents within Weible's reach. Furthermore, Weible's testimony about the dissemination of Slivka's deposition testimony does not demonstrate a violation of the protective order. We cannot find that the trial court abused its discretion in refusing to grant Doctor's Associates' motion for sanctions.

The final issue for our review is whether the trial court erred in submitting Substantial's claim for punitive damages to the jury.

Defendant first argues that Illinois punitive damages law violates the due process and equal protection clauses of the United

States Constitution because Illinois punitive damages law contains no limiting standard and, therefore, allows a jury unfettered discretion to fashion punitive damages awards. While it has been suggested that unlimited jury or judicial discretion in fixing punitive damage awards may border on unconstitutionality (*Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032), the Supreme Court has also noted that general concerns of reasonableness and adequate guidance from the court when a case is tried to a jury enter into the constitutional equation. *Haslip*, 499 U.S. at 18, 113 L. Ed. 2d at 19, 111 S. Ct. at 1043.

By its instructions, the trial court informed the jury that the plaintiff sought punitive damages to punish the defendant's willful and wanton conduct. The jury was instructed that in order to find in favor of the plaintiff the jury had to find the plaintiff proved each of the following propositions:

"First, that Defendant Doctor's Associates, Inc. willfully and with wanton disregard of the rights of others failed to perform its promises and obligations under the franchise contracts with Plaintiff in good faith and with fair dealing; and

Second, that Defendant Doctor's Associates, Inc. acted willfully and with wanton disregard for the rights of others in making false representations of material fact, known to be false by Defendant, made to induce the Plaintiff to act, causing Plaintiff to justifiably act in reliance on said representations and that Plaintiff was caused to incur damages for breach of contract and Plaintiff is entitled to recover punitive damages as a result of Defendant's willful and wanton conduct."

The court described willful and wanton conduct as conduct which shows utter indifference to or conscious disregard for another. The court also advised the jury of the purpose of an award of punitive damages:

"If you find that the Defendant's conduct was willful and wanton and caused injury to the Plaintiff, and if you believe that justice and the public good require it, you may, in addition to any damages to which you find the Plaintiff entitled, award an amount which will serve to punish the Defendant and to deter others from the commission of like offenses."

The instructions gave the jury considerable discretion in its determination of punitive damages. However, that discretion was not unlimited. The jury was required to assess the evidence and determine whether defendant's conduct was willful and wanton. The

definition of willful and wanton was particularly described for the jury. We also find it significant that the instructions required that the plaintiff prove, in order to recover, not only that defendant acted willfully and with wanton disregard in making false representations to the plaintiff, but that defendant acted willfully and with wanton disregard in failing to perform its promises and obligations under the franchise contracts in good faith and with fair dealing.

Apart from the instructions, the punitive damages award was subjected to judicial scrutiny by the trial court after defendant filed its post-trial motion contesting the award. The trial court is empowered under section 2—1207 of the Code of Civil Procedure (735 ILCS 5/2—1207 (West 1992)) to reduce punitive damages awards and/or to apportion the award. The trial court did neither in this case. Based on the jury instructions and the protective safeguards provided, we find that defendant's interests were reasonably accommodated and due process was satisfied.

Defendant also argues that the Illinois punitive damages law violates the equal protection clause of the United States Constitution because it promotes arbitrary and irrational discrimination at the unfettered whim of the jury. Defendant maintains that punitive damages awards are a product of discrimination against the wealthy, out-of-State defendants such as Doctor's Associates and those who are similarly situated. It is true that arbitrary and irrational discrimination violates the equal protection clause (*Bankers Life & Casualty Co. v. Crenshaw* (1988), 486 U.S. 71, 83, 100 L. Ed. 2d 62, 75, 108 S. Ct. 1645, 1653); however, we cannot conclude that the Illinois punitive damages law violates equal protection.

Under an equal protection analysis, the Illinois punitive damages law will be sustained if "the classification *** is rationally related to a legitimate state interest." (*Bankers Life*, 486 U.S. at 81, 100 L. Ed. 2d at 74, 108 S. Ct. at 1652.) Punitive or exemplary damages are not awarded as compensation but serve instead to punish an offender and to deter that party and others from committing similar acts of wrongdoing in the future. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.) Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that they are not improperly or unwisely awarded. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210.) In this case the jury was not free to assess punitive damages without limitation. We find that the jury instructions and procedural safeguards assured against ar-

bitrary and irrational discrimination violative of the equal protection clause.

Defendant complains that the jury's privilege of determining an award of punitive damages encourages discrimination. The award of punitive damages has always been left to the jury's discretion, as the degree of punishment to be inflicted must depend on the peculiar circumstances of each case. (*Haslip*, 499 U.S. at 15-16, 113 L. Ed. 2d at 18-19, 111 S. Ct. at 1042, citing *Day v. Woodworth* (1852), 54 U.S. (13 How.) 363, 371, 14 L. Ed. 181, 185.) Because the award of punitive damages is apt to be higher where the punishment of a wealthy party is concerned does not necessarily establish that punitive damages single out the wealthy. Punitive damages by their very nature serve to punish the wrongdoer. It is logical that a punitive damages award against a party with great wealth must be greater than an award against a party with meager wealth, as the purpose of punitive damages is to punish the wrongdoer. Moreover, defendant has failed to demonstrate how punitive damages discriminate against out-of-State defendants. Without more than a cursory statement to that effect, we decline to speculate as to defendant's allegation.

Defendant's next argument regarding the award of punitive damages is that such damages are not recoverable under the theories Substantial submitted to the jury. Specifically, Doctor's Associates contends that Substantial's only claim was for breach of contract for which punitive damages are not recoverable.

The jury was instructed as follows on Substantial's claim for punitive damages:

"In Count II of its Complaint, Plaintiff Substantial Enterprises, Inc. claims that Defendant Doctor's Associates, Inc. did the following:

1. Willfully and with wanton disregard of the rights of others failed to perform its promises and obligations under the Franchise Contracts with Plaintiff in good faith and with fair dealing in one or more of the following respects:

(a) Defendant gave approval to Plaintiff to put Subway restaurants in Mid Rivers Mall, Alton Square Mall and a future site in St. Clair Square and, with knowledge of Plaintiff's commitment to the May Centers, Inc., withdrew the approval;

(b) Defendant approved a second group of site locations in Troy, Granite City and Belleville, Illinois and then, because of the dispute with Plaintiff over Mid Rivers Mall,

Defendant refused to allow Plaintiff to open a Subway restaurant at any of these three locations or to buy additional franchises;

(c) Defendant filed five eviction lawsuits against Plaintiff before resolving the issue of default on the Mid Rivers Subway location by either arbitration or litigation.

2. And by willfully and wantonly making one or more of the following representations to Plaintiff:

(a) That Defendant would not unreasonably withhold site approval;

(b) That disputes would be resolved by arbitration and that eviction actions would not be initiated until and unless the issue of default had first been decided in favor of the Defendant by arbitration or litigation;

with knowledge that the above mentioned representations were false; and the representations were made by Defendant with the intention to induce Plaintiff to purchase franchises and to purchase additional franchises; and Plaintiff justifiably acted in reliance on said representations in purchasing eight franchises, opening five Subway restaurants and lining up investors and financing to implement a development plan and, as a direct consequence of the falsity of Defendant's representations, Plaintiff was caused to suffer damages for breach of contract.

Plaintiff seeks punitive damages to punish Defendant's willful and wanton conduct.

The Defendant Doctor's Associates, Inc. denies that it did any of the things claimed by the Plaintiff, denies that it was fraudulent in doing any of the things claimed by the Plaintiff and denies that any claimed fraudulent representation on the Defendant's part was a proximate cause of the Plaintiff's claimed injuries."

The jury was thus instructed it could award punitive damages if it found that Doctor's Associates acted willfully and wantonly in fraudulently misrepresenting its method of resolving disputes with franchisees and/or fraudulently misrepresenting its method of approving site locations.

Doctor's Associates argues that Substantial's only claim is for breach of contract for which punitive damages are not recoverable. Doctor's Associates points out that as a general rule punitive damages are not recoverable for breach of contract. (*Morrow v. L.A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87, 94, 492 N.E.2d

181, 183.) An exception to this rule arises when conduct causing the breach amounts to an independent tort for which punitive damages are recoverable. (*Morrow*, 112 Ill. 2d at 94, 492 N.E.2d at 184; *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 444 N.E.2d 657.) However, merely describing a breach as willful and wanton does not convert a breach of contract claim into a tort claim. See *Morrow*, 112 Ill. 2d at 98, 492 N.E.2d at 185.

Doctor's Associates maintains that in order to avoid this well-established rule, Substantial has tried to disguise its claim for breach as a tort of willful and wanton conduct involving fraudulent misrepresentation. The two obligations Substantial asserts Doctor's Associates committed to and then disavowed relate to (1) withholding site approval and (2) filing eviction actions without first resolving the issues by arbitration or litigation. Doctor's Associates argues that these actions, which Substantial claims constitutes the purported tort, are precisely the obligations which form the basis of plaintiff's claim of breach of contract.

It is clear that Substantial's claim for breach of contract parallels its claim for punitive damages in that the same conduct is involved in each claim. The difference between the two claims, however, is that the punitive damages claim alleges the conduct was performed willfully and wantonly with Doctor's Associates fraudulently misrepresenting material facts. Substantial argues that the fact that the claim for punitive damages arises from the action for breach is of no matter because the breach in this case constitutes an independent tort for which punitive damages are recoverable. Plaintiff relies on *Bank of Illinois v. Bill's King City Stationery, Inc.* (1990), 198 Ill. App. 3d 434, 555 N.E.2d 1133, as authority.

In *Bill's King City*, the owners of a corporation agreed to sell the stock of the corporation to Petersen, the third-party defendant. The parties' agreement provided that the sellers would retain title and possession of the stock until paid in full, and that Petersen would operate the business as general manager until that time. Petersen further agreed not to obligate the corporation for any debts other than those incurred in the normal course of operations. While the owners still retained possession of the stock, Petersen obtained a loan from the plaintiff bank, pledged the assets of the corporation as security, and signed off on the loan as president of the company. While Petersen stated that the loan would be used for purchasing inventory and working capital, he in fact used the loan to repay a personal debt. He eventually ceased making payments to the owners for their stock. The owners sued Petersen for breach of

the stock-purchase agreement and for fraud. On appeal, the award of punitive damages was upheld on the fraud claim because the court found a fraud independent of Petersen's breach of his agreement with the owners. Petersen not only breached his promise to pay for the stock, he committed a fraud when he transformed his personal indebtedness into a corporate indebtedness and pledged the corporation's assets when he did not even own the company's stock.

■■■ In the instant case, evidence was presented that under the Illinois Franchise Disclosure Act of 1987 (Ill. Rev. Stat. 1987, ch. 121½, par. 1701 *et seq.*) Doctor's Associates was required to deliver a disclosure statement of its business practices and the details of its franchise contracts to prospective franchisees. Substantial's theory behind its claim for punitive damages is that Doctor's Associates not only failed to make full disclosure but also made overt fraudulent misrepresentations as to its business experience, the details of the franchise contract, and the relationship of the franchisor-franchisee. Evidence was presented that the promotional brochure, on which Doctor's Associates admits prospective franchisees are permitted to rely, represents that Doctor's Associates' approach is anti-authoritarian and democratic. Contrary to the express language of the promotional brochure, the franchise agreements, and the sublease agreements, Doctor's Associates admitted that it relied on eviction lawsuits to control franchisees. Leonard Axelrod testified that it was Doctor's Associates' practice to exert control over the franchisee through the sublease agreement. The franchise agreement and sublease agreement do not notify the franchisee that Doctor's Associates' method of resolving disputes as to whether the franchisee is in default is by filing eviction lawsuits rather than via arbitration or litigation.

The promotional materials distributed by Doctor's Associates represented that existing franchisees did not have territorial rights and that franchisees would not unreasonably be denied site approval. These materials also represented that Doctor's Associates would act in good-faith and would make good faith efforts to negotiate any disputes with its franchisee. In this case, there was evidence that Hossein Naemi approved the three-mall deal and Substantial committed to the mall-leasing representative to execute leases for the sites, only to have Doctor's Associates disavow its approval of the sites. Substantial went ahead with opening a deli in the Mid Rivers Mall under the name SubCity. The evidence demonstrated that Doctor's Associates warned Substantial that Doctor's

Associates would evict and bankrupt Substantial unless Substantial converted the SubCity into a Subway, paid $7,500 for that franchise, purchased Kelly Clapp's store, and paid royalties to Doctor's Associates on all sales at the SubCity from the date it was opened. There was evidence that negotiation between Doctor's Associates and Substantial as to their differences in opinion regarding this matter was virtually nonexistent.

Additional evidence was presented that after Substantial failed to comply with Doctor's Associates' demands Doctor's Associates refused to permit Substantial to use any of its three purchased-but-unused franchise agreements and refused to sell Substantial any new franchise agreements. Cox testified that Axelrod told him that Substantial was "stopped cold."

Based on the evidence, we conclude that the jury could find that the willful and wanton fraudulent misrepresentation was extraneous to the breach, amounting to an independent tort for which punitive damages could be awarded.

Doctor's Associates argues that even if punitive damages are recoverable in this case, the trial court should not have submitted the issue to the jury because Doctor's Associates' conduct was not outrageous enough to warrant punitive damages. Defendant notes that for an award of punitive damages to be proper the conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 415-16, 563 N.E.2d 397, 402.) Defendant claims that the case at bar simply involves a private business dispute that arose in the context of an arm's length business transaction, and the imposition of punitive damages in such a circumstance is clearly erroneous. Substantial maintains that there was sufficient evidence that Doctor's Associates willfully, wantonly, and with reckless disregard made fraudulent misrepresentations which induced the plaintiffs into entering into a franchisee/franchisor relationship. Promises Doctor's Associates previously made were not kept, and threats of eviction were made in attempts to coerce Substantial into performing at the specific direction of Doctor's Associates.

Punitive damages are intended to punish the wrongdoer and to deter that party and others from committing similar acts in the future. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.) Under the facts of this case, we cannot conclude the trial court erred in denying defendant's post-trial relief from the jury's imposition of punitive damages.

In light of the foregoing, we affirm the decision of the circuit court of Madison County as to both the appeal and the cross-appeal.

Affirmed.

GOLDENHERSH and WELCH, JJ., concur.