THE YOUNG MEN'S CHRISTIAN ASSOCIATION OF WARREN COUNTY, Plaintiff-Appellee and Cross-Appellant, v. MIDLAND ARCHITECTS, INC., Defendant-Appellant and Cross-Appellee (Carl A. Nelson & Company *et al.*, Defendants).

Third District   No. 3—88—0018

Opinion filed September 28, 1988.

Gary D. Nelson, of Heyl, Royster, Voelker & Allen, of Peoria (Mark D. Howard, of counsel), for appellant.

Greg McClintock, State's Attorney, and Ronald D. Stombaugh, of Beal, Pratt, Pratt & Stombaugh, both of Monmouth, for appellee.

JUSTICE BARRY delivered the opinion of the court:

Plaintiff YMCA (the Y) brought an action to recover damages for breach of contract against defendant Midland Architects with regard to a roof system on plaintiff's building. Before trial, plaintiff received payments totalling $86,750 in settlement with the general contractor and the roofing manufacturer. The jury returned a verdict for plaintiff and fixed damages in the amount of $70,000. Then upon defendant Midland's motion, a setoff in the amount of $86,750 was allowed against damages of $129,988, as determined by the court, and the verdict was reduced to $43,238. Midland appeals from that portion of the order which determined total damages to be $129,988, and Midland seeks to have the entire setoff applied against the verdict of $70,000, thereby reducing the verdict to $0. Plaintiff has cross-appealed, asking that the order be reversed and the verdict reinstated.

The following facts were not disputed at trial. In 1977 the Warren County YMCA contracted with Midland Architects, Inc., to design a new YMCA building. Because the building committee members had some knowledge of roof problems on other buildings, the architects were told to provide a roof of the same type as was on the Y building in Keokuk, Iowa. That was a roofing system manufactured by Dow Chemical which placed the roofing membrane next to the roof deck with extruded polystyrene insulation over the membrane and finally a layer of gravel on top. The specifications for the Warren County Y specified a Dow roof system.

The general contractor for the project, Carl A. Nelson & Co., at

the request of the roofing subcontractor, asked Midland to substitute a newer roof system of similar design using Celotex materials. This system also was also an inverted design with the roof membrane next to the deck, but the insulation was urethane with felt facers on both sides and asphalt over the top. In October of 1977, Midland agreed to substitute the Celotex system after reviewing the manufacturer's specifications of the new system, but the substitution was not discussed with the Y.

The contract required the general contractor to obtain a 10-year guarantee from the manufacturer of the roof, and it was the responsibility of the architects to receive all the specified warranties and to transmit them to the owner. One year after the construction was completed, in February of 1980, the roofing subcontractor sought to obtain the required warranty from Celotex, but Celotex refused on the ground that the slope of the roof was less than the one-quarter inch per foot required for use of its inverted roof system. (The design of the Y specified a one–sixth-inch slope per foot.) However, by the end of 1979, Celotex was no longer marketing its inverted roof system because the system did not perform as expected. The roofing subcontractor provided its own 10-year guarantee of the roof, and at the recommendation of the architects, the Y accepted the roofing subcontractor's warranty in lieu of one from Celotex. Subsequently the subcontractor filed bankruptcy and did not honor its guarantee.

Construction of the Y was completed in February of 1979. During the summer of 1979 the Y experienced its first leaks. Attempts were made to repair the roof, but it was discovered that the insulation was saturated with water and that water was standing on the roof under the insulation. Since water is a conductor of heat, all the insulation value of the roofing system was lost. In 1982, it was necessary to have a new roof installed on the swimming pool portion of the building at a cost of $23,188. In 1985, a new roof costing $82,000 was installed on the rest of the building. In addition, interior repairs to ceilings and the gym floor cost $800. Ten-year warranties were obtained for the new roof systems.

D. F. Jennings, an expert witness for plaintiff, testified that he estimated that the Y suffered increased fuel costs of $24,000 from energy losses resulting from the defective roof. The witness testified that he used a standard formula for the computation, and that one of many factors in that formula was an assumed interior temperature of 65°. Jennings also testified that he obtained information concerning the heating practices at the Y from the executive director, who advised him that the pool area was kept at 85°, the offices at 70°-72°,

and the gym at 65°. Thus, Jennings stated that he ascertained that his figures were conservative as to the interior temperature. Another factor used in the formula was the R value of the insulation, meaning the thermal resistance. The manufacturer's data indicated that the R value of a Dow roof was 10.0, for the Celotex roof used was 11.1, and for the new roof installed in 1985, 20.

Plaintiff argued to the jury that the architects were liable for the full amount of the damages shown by the evidence, $129,988, because they failed to fulfill their obligations under the contract. The damages resulted, it was said, from a failure to use a Dow roof as the contract specified. Defendant, on the other hand, argued that the general contractor was the one who was bound to build the building according to the specifications in the contract. Furthermore, defendant argued that the Celotex roof was considered to be equal to the Dow roof in 1977 at the time the substitution was made. Defendant architects also argued in the alternative that, if they were liable, they were not liable for the full amount of damages since the Y now has a better roof than the original specifications called for. Among other things, the warranties are now extended to 1995 on the main roof, rather than 1987 as originally provided, and the roof has more insulation value. Also, the Y had the use of the original roof for several years. Defendant urged the jury to ascribe values to those elements and to reduce the damages by that amount.

As indicated above, the jury returned a verdict in favor of plaintiff in the amount of $70,000. Upon defendant's motion to set off the full amount of the settlement paid by the general contractor and by Celotex, $86,750, against the verdict, the trial court ruled that the jury had apportioned the damages between Midland Architects and the defendants not present (Carl A. Nelson & Co. and The Celotex Corporation). The court then found that the total damages to plaintiff were $129,988, that defendant was entitled to a setoff of the amount of the settlement, and that the correct amount of defendant's liability was $43,238. Neither party was happy with the court's determination, and both parties appeal as aforesaid.

Midland contends that the trial court erred in ruling that the jury had apportioned the damages between the various defendants. Midland correctly points out that the jury instructions did not ask the jury to divide the damages between the architect and/or the general contractor and/or the roofing manufacturer. The jury was instructed to determine the total amount of damages resulting from the architects' breach of contract. Of equal importance is the fact that, under the evidence, all the damages flowed from the use of the Celotex in-

verted roof assembly instead of the specified Dow system.

This is a case where the actions of all the defendants (the architects, the general contractor, and the roofing manufacturer) caused a single, indivisible injury to plaintiff as a result of the construction and installation of a defective roof. Although there was a single injury, the amount of damages included several different elements, some of which were disputed by defendant Midland. The jury was urged by defendant not to give plaintiff a windfall by awarding the entire cost of the new roofs and the claimed energy losses as damages when the actual damages were less than that claimed by plaintiff.

■■ ■ We have carefully reviewed the record, and we find that there is no basis in the evidence or the jury instructions for the finding by the trial court that the jury verdict reflected anything other than a determination of the damage caused by Midland pursuant to the instructions. The ruling of the trial court was, therefore, error. Obviously, when plaintiff elected to accept the settlements offered by the other two defendants and to proceed to trial with the architects, plaintiff was accepting the risk of whatever the jury would return against Midland.

The law is well settled that, where there is a single and indivisible injury, the damages are inseparable and any amounts received from any of the defendants must be deducted from the total damages sustained. (*Weaver v. Bolton* (1965), 61 Ill. App. 2d 98, 209 N.E.2d 5.) Applicable to the case at bar is the holding in *Eberle v. Brenner* (1987), 153 Ill. App. 2d 700, 702, where the court said:

> "An injured person is entitled to one full compensation for his injuries, and a double recovery for the same injury is against public policy. [Citation.] Thus, a plaintiff who has recovered for his damages should have no basis to complain because a defendant benefited from a setoff."

■ Plaintiff YMCA argues that Midland waived any right to claim a setoff by not pleading it as a cross-claim. Plaintiff relies upon section 2—608 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—608), which provides:

> "(a) Any claim by one or more defendants against one or more plaintiffs, or against one or more codefendants, whether in the nature of setoff, recoupment, cross claim or otherwise, and whether in tort or contract, for liquidated or unliquidated damages, or for other relief, may be pleaded as a cross claim in any action, and when so pleaded shall be called a counterclaim."

Plaintiff insists that a request for setoff asserted for the first time in

a post-trial motion is the equivalent of seeking relief without a pleading. See *Bartsch v. Gordon N. Plumb, Inc.* (1985), 138 Ill. App. 3d 188.

Section 2—608 is plainly permissive, unlike Rule 13(a) of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 13(a)), which provides for compulsory counterclaims that must be asserted or waived. (Ill. Ann. Stat., ch. 110, par. 2—608, Historical and Practice Notes, at 183 (Smith-Hurd 1983).) We are of the opinion that the better view is that expressed by the court in *Miller v. Bank of Pecatonica* (1980), 83 Ill. App. 3d 424, 427, 403 N.E.2d 1262, 1264, which interpreted section 2—608 as follows:

> "[W]hile this section is designed to simplify the litigation between parties by providing that all issues can be tried in one forum at the same time, it does not require a defendant to immediately assert his rights by way of counterclaim if it would be inconvenient or strategically inadvisable for him to do so. The word 'may' in the quoted words of the statute indicate an election is available to the defendant and the cases have so interpreted this section."

In the case of a pretrial settlement with some but not all of the defendants, assertion of defendant's right to setoff in a motion following the trial is appropriate and "strategically advisable." Accordingly, in the case at bar we hold that defendant did not waive its right to a setoff by failing to plead it as a counterclaim.

■ Defendant also asserts as error the ruling of the trial court allowing plaintiff's expert witness Jennings to testify as to the heating and cooling practices of the YMCA based upon a conversation between Jennings and the executive director of the Y. Defendant contends that this conversation was impermissible hearsay evidence, while plaintiff says the testimony was admissible as background data for expert opinion evidence under Federal Rule of Evidence 703 (Fed. R. Evid. 703). As we have indicated previously, Jennings testified that, in computing the cost of plaintiff's energy loss, he used a formula that was standard in the industry and which assumed a 65° interior temperature. He also testified that he verified the validity of that assumption with the executive director of the Y. Thus, he was not testifying to the truth of the air temperature data, and furthermore, he did not rely upon the data provided by the executive director in reaching his opinion. Thus, Federal Rule of Evidence 703, as adopted by the Illinois Supreme Court (*Wilson v. Clark* (1981), 84 Ill. 2d 186), does not apply.

Defendant did not object to the admissibility of this evidence in its

post-trial motion. To the extent that plaintiff is claiming an error in the admissibility of this testimony, we hold any error to have been waived. Defendant argues, further, that the *real* error was the acceptance of the energy loss evidence as part of the total damages proved when the trial court made its ruling. In other words, when the trial court ruled that the total damages established by the evidence was $129,988, the court erroneously included the calculation of energy loss based upon improper hearsay. Since we have ruled that the trial court erred in ruling the total damages were greater than the jury verdict, this issue has become moot.

For the reasons stated, we reverse the judgment of the circuit court of Warren County and remand this cause with directions that the verdict returned by the jury be reinstated, that a setoff of $86,750 be allowed, and that a judgment in accord with this opinion be entered.

Reversed and remanded with directions.

WOMBACHER and HEIPLE, JJ., concur.