Third Division
March 5, 1997

1-95-4264


THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM
 ) THE CIRCUIT COURT
 Plaintiff-Appellee, ) COOK COUNTY.
 )
 )
 v. ) No. 92 CR 8536
 )
 ) 
 ) 
THE ALMIGHTY FOUR HUNDRED, ) THE HONORABLE,
 ) DENNIS DERNBACH
 Defendant-Appellant. ) JUDGE PRESIDING.


 PRESIDING JUSTICE COUSINS delivered the opinion of the
court:
 Following a bench trial, defendant, The AlMighty Four
Hundred, was found guilty of first-degree murder and concealment
of a homicidal death. The trial court sentenced defendant to 70
years imprisonment. On appeal, defendant argues that: (1) the
prosecution failed to prove him guilty beyond a reasonable doubt;
(2) the trial court erroneously admitted statistical probability
testimony; and (3) the defendant s right to confront and examine
witnesses against him was violated when the prosecution
introduced hearsay by a nontestifying witness involving the
statistical probability of a DNA match.
BACKGROUND
 On the morning of February 28, 1994, the body of 16-year-old
Lakeisha McAllister was found in a garbage dumpster in an alley
adjacent to the Grand Ashland Hotel in Chicago. She had been
strangled and her throat had been slashed. At trial, the
following evidence was elicited. 
 Salvator Martorina testified that he owns the building
located at 466 Ashland. The building contains shops on the first
floor and apartments on the upper floors, which are known as the
 Grand Ashland Hotel. Martorina had employed defendant for
about six months prior to the murder as the building security 
manager. Defendant lived on the third floor of the building. 
Martorina testified that he knew the victim and had seen her at
the hotel for two to three months previous to the murder. 
 The hotel office was on the second floor of the building. 
Adjacent to the office was a kitchen and bathroom. From the
street, there was a flight of stairs to the second floor. The
door to the second-floor hotel entrance had a security buzzer
lock, but the door was often propped open by tenants. The hotel
rooms do not have bathrooms but share a common bathroom in the
hall. The office was not cleaned regularly. When Martorina saw
the office on Sunday, February 27, it was dirty and cluttered
with debris. When he returned the next day, the office looked
and smelled clean and the furniture was rearranged. Martorina,
defendant and a woman who had been employed at the hotel, but who
had not been seen in one to two months, possessed keys to the
office area. 
 Other testimony revealed that on the night that she was
murdered, the victim called her foster mother, Earnestine Bynum,
sometime between 10:30 p.m. and midnight, to tell her that she
would be returning to the Bynum household. Bynum did not notice
anything unusual about the victim's voice. Forty-five minutes to
an hour after the victim's call, defendant called Bynum to see if
the victim had arrived there. The victim did not arrive that
night.
 At 10:50 a.m. on February, 28, 1994, police officer William
Smith received a call about a body found in a garbage dumpster at
1626 West Ferdinand Street, which is approximately 200 feet south
of Grand Avenue and 90 yards away from the hotel. At the scene,
the officer observed the victim's body in the dumpster and noted
that she had blood on her head, face and upper body clothing. 
 At 11:20 a.m. on February 28, 1994, John Redmond, a Chicago
police department evidence technician, arrived at the alley crime
scene. He observed the victim's body in the garbage dumpster
and blood in the snow. He and other officers then walked to the
hotel. Defendant invited the officers into his apartment after
meeting them in the alley. The officers noticed a stain on
defendant's pants and took the pants to the police crime lab. 
 On March 2, 1994, Officer Alfred Perez examined the hotel's
office after noting the smell of cleaning solution. Perez noted
that the office had a single entrance with two locks on the door. 
He called the crime lab technicians after he saw what he
suspected were bloodstains on the oven in the kitchen area. 
 On March 2, 1994, Officer Gregory Janicki examined the
kitchen area of the hotel and recovered blood samples from
various locations in the kitchen.
 Cora Pittman testified that she lived in the hotel, in room
212, down the hall from defendant s room. Pittman testified that
she knew the victim and knew that the victim lived with defendant
in room 210. At about 10 or 10:30 p.m., on February 27, 1994,
Pittman walked down the hall to use the common bathroom. As she
passed defendant s room, she heard the victim screaming and
yelling. She heard the victim scream get off me and saw that
the door to defendant s apartment was slightly open. Pittman
could see inside the apartment and saw the victim on the floor
with defendant on top, punching her. Pittman testified that she
heard the victim say: Get off me, I m going to tell everything. 
Defendant said, I m going to kill you, if you don t shut up
bitch. Pittman went back to her room but heard more noise coming
from defendant s room. After hearing tumbling and screaming for
about 20 to 25 minutes, Pittman looked into the hall and saw the
victim run into the hallway towards the door leading to the back
stairwell. Defendant chased the victim, grabbed her and dragged
her by her hair back to his apartment. Pittman then heard more
 tumbling noises and screaming coming from defendant s room.
 Around 4 a.m., defendant knocked on Pittman s door and asked
for her eldest son. He had never done this before. Pittman told
defendant that her son was asleep. Pittman testified that
defendant was wearing black pants and no shirt and had a towel
around his neck. His body was soaking wet. Pittman identified
the pants she saw defendant wearing that night. Defendant left
her door but came back four more times. 
 Joe Brooks testified that he knew the victim. On February
27, 1994, Brooks received a telephone call from the victim at
about 10:30 p.m. or 10:45 p.m. The victim was crying. Although
Brooks told the victim that he would pick her up at the hotel at
11:15 p.m., he did not. 
 Elizabeth Taylor testified that she is a friend of Lakeisha
McAllister and her twin sister. She and another woman, Olivia
Brown, went to the hotel in the evening on February 27, 1994, at
approximately 1 a.m. When they entered the hotel, they saw the
defendant in the office. Defendant was standing there wearing
black sweat pants, no shirt, and a black jacket, which was open. 
Taylor and Brown spoke to defendant, who stated that he did not
know where the victim was. Taylor and Brown went upstairs but
they did not find the victim. Taylor testified that she did not
notice anything unusual in the 10 to 15 minutes that she was at
the hotel that night. 
 Ayanna Montgomery testified that she became a friend of the
victim because her sister lived in room 204 of the Grand Ashland
Hotel. Montgomery would spend weekends at the hotel with her
sister. Room 204 was located directly above the hotel office. 
Room 210, where defendant and the victim resided, was down the
hall from room 204. Montgomery testified that she spent the night
of February 27, 1994, at the hotel. She was awakened in the
middle of the night by screams that sounded nearby. The screams
were those of a female shouting, "Stop, leave me alone, get your
fucking hands off me." Montgomery did not look at a clock but
guessed, by looking at the position of the moon, that the screams
occurred at 3 a.m. Montgomery also noted that the kitchen
adjacent to the office of the hotel had been filthy the day
before the murder, but clean the day after the murder.
 The State presented Therese Finn, a forensic biologist for
the Chicago Police Department Crime Laboratory. Finn testified
that blood taken from defendant's pants matched that of the
victim. The likelihood of that blood coming from someone other
than the victim is "less than one in a billion." Finn also
testified that blood recovered from the jacket defendant was
wearing on the night of the murder also matched that of the
victim and the likelihood of such a match is "less than one in a
billion." Finn also testified that blood taken from the kitchen
area of the hotel office matched the victim's blood. The
probability of such a match is "less than one in a billion." 
 Defendant's expert, Sandy Zabell, a professor of mathematics
and statistics, testified that, according to his calculations,
the frequency of seeing a match between the blood at the crime
scene and the victim's blood was 1 in 3 to 4 million, or 1 in 1.2
million if the most conservative calculation was done. 
 The trial court found defendant guilty of first-degree
murder and concealment of a homicidal death. After hearing
evidence in aggravation and mitigation, the trial court sentenced
defendant to 70 years in the Department of Corrections for first-
degree murder.
 We affirm.
ANALYSIS
 I
 We will first address defendant s second issue. Defendant
argues that it was error for the court to admit statistical
probability testimony, where no single method has been generally
accepted within the scientific community. The State contends 
that the trial court properly admitted Finn's testimony and that
evidence concerning alternate methods of computing statistics
went to the weight to be given that evidence, not its
admissibility. 
 At trial, the State tendered Therese Finn as an expert in
forensic biology and forensic DNA analysis. Finn is a forensic
biologist for the Chicago Police Department Crime Laboratory
(CPD). She has a bachelor of science degree in biology from the
University of Illinois. At the time of the trial in this case,
she was working on her master of science degree in biotechnology
at the Illinois Institute of Technology. Finn received training
in forensic DNA at the Forensic Science Research and Training
Center of the Federal Bureau of Investigation (FBI) and attended
numerous workshops, seminars and meetings conducted by other
forensic laboratories throughout the country. At the CPD, Finn 
was trained in serology, the analysis of blood and other bodily
fluids such as semen and saliva. She was one of three analysts
who established the DNA program at the CPD. Finn has conducted
hundreds of DNA analyses. In addition, Finn testified that she
has given numerous presentations and lectures to members of the
legal and scientific communities on various aspects of DNA
testing.
 Finn testified that the chemical deoxyribonucleic acid (DNA)
is the genetic material that is found in a person's cells which
contains a "blueprint" of all genetic information necessary for
life. Except in the case of identical twins, each person's DNA
is totally unique. In the human body, DNA is present in every
single cell that has a nucleus. Finn defined forensic DNA
analysis as conducting DNA tests on blood samples and comparing
the results with the DNA of known blood standards for the purpose
of determining if an individual can be included or excluded as a
possible contributor of the sample. 
 Finn explained that in forensic DNA analysis, DNA is first
isolated from blood cells. Following a series of steps, a
pattern of DNA bands is generated by which different DNA fragment
lengths can be compared. This process is referred to as
Restriction Fragment Length Polymorphism (RFLP) analysis. A DNA
molecule is composed of 3 to 4 billion "base pairs" of four
different chemicals. The particular pattern of these base pairs
dictates an individual's genetic characteristics. RFLP profiling
focuses on the areas of the DNA molecule where there is a
significant variation between individuals of a base pair pattern. 
Finn explained that, in this case, DNA was isolated from the
blood cells. The base pairs seen in the DNA in the blood
collected at the crime scene were then compared visually and
mathematically with base pairs in the DNA from blood taken from
the victim and the defendant. In this case, DNA in blood found
on defendant's clothes and in the hotel matched the DNA in the
victim's blood. 
 In order to make the matches meaningful, statistical
analysis is required. After a match is determined visually and
mathematically, analysts calculate the frequency or rarity of
seeing a particular DNA pattern to the frequency of seeing this
combination in the general population. To accomplish this, DNA
analysts have generally used either the "product rule" or the
"ceiling principle." 
 Finn testified that she performed DNA analysis on a large
stain on the pants police recovered from defendant. The DNA in
this blood was compared to the victim's blood. A match was
determined visually and mathematically. The rarity of seeing
this match in the population was then calculated using the
"product rule." Finn testified that the likelihood of a randomly
selected individual having the same DNA profile that was
generated from the victim's blood was "less than one in a
billion." In other words, the likelihood that the blood on
defendant's pants came from someone other than the victim is less
than one in a billion. A DNA profile was also generated from the
blood found on the jacket that defendant was wearing on the night
of the murder. The DNA profile of the blood on defendant's
jacket also matched the victim's profile, and the likelihood of a
randomly selected individual having the same DNA profile is "less
than one in a billion." A DNA profile was also generated from
the blood found in the kitchen. The DNA profiles from these
three samples also matched the victim's DNA. Finn testified that
the probability of this DNA profile being found in a randomly
selected individual is "less than one in a billion." Finn
testified that if the "ceiling principle" were used in
calculating these statistics, the resulting frequency would be 1
in 3.4 million.
 Defendant argues that a statistical probability estimate
should not have been admitted because population genetic
statisticians disagree as to whether the "product rule" or the
"ceiling principle" should be used for calculating such
probabilities. 
 The decision of whether to admit expert testimony about a
new scientific technique is committed to the sound discretion of
the trial court. People v. Eyler, 133 Ill. 2d 173, 212, 549
N.E.2d 268 (1989). Illinois follows the standard as delineated
in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), for the
admission of novel scientific evidence. Frye requires that the
evidence be generally accepted in the relevant scientific
community before it can be admitted. Frye, 293 F. at 1014; 
People v. Thomas, 137 Ill. 2d 500, 517, 561 N.E.2d 57 (1990).
 Defendant relies on Illinois Appellate Court holdings in
Franson v. Micelli, 269 Ill. App. 3d 20, 645 N.E.2d 404 (1994),
vacated, 172 Ill. 2d 352, 666 N.E.2d 1188 (1996), and People v.
Watson, 257 Ill. App. 3d 915, 629 N.E.2d 634 (1994). In both
Micelli and Watson, the appellate court barred the introduction
of probability statistics evidence and held that the methodology
by which statistical probabilities are derived has not been
generally accepted in the relevant scientific community. 
 Our supreme court recently addressed the issue of whether
the "product rule" is generally accepted in the scientific
community in People v. Miller, 173 Ill. 2d 167, 670 N.E.2d 721
(1996). In Miller, the defendant argued that DNA evidence based
on calculations using the "product rule" was erroneously admitted
against him at his trial in light of Watson, 257 Ill. App. 3d
915, 629 N.E.2d 1188. Miller, 173 Ill. 2d at 183. The Miller
court discussed and then dismissed the finding in Watson that the
"product rule" should not be used in calculating the statistical
probability of a match. 173 Ill. 2d at 188-90. The court noted
that the controversy over the use of the method was present in
1991 when the court heard the Watson case, but now appeared to be
dissipating. 173 Ill. 2d at 188. The court concluded that since
the scientific and legal status of the "product rule" has
continued to evolve and become accepted by experts and courts,
the trial court did not abuse its discretion in allowing the DNA
expert to testify regarding the expert's use of the "product
rule" and its resulting statistics. Miller, 173 Ill. 2d at 189-
90.
 The Miller case is dispositive of this issue. The Miller
court held that Watson is no longer controlling and that the use
of the product rule is proper. Accordingly, we hold that, in the
instant case, the trial court did not abuse its discretion in
allowing Finn's testimony regarding the DNA evidence.
 II
 Defendant also contends that his right to confront and
examine witnesses against him was violated when the prosecution
was allowed to introduce hearsay by a nontestifying witness, Dr.
Michael Conneally.
 At trial, Finn testified that after two evidence samples
are deemed to have matched, a statistical value is attached to
the match to illustrate the rarity or frequency of seeing such a
match. To do this, DNA samples are taken from a random
population of individuals and the frequency of seeing certain
patterns of DNA in the random population is determined. The
random population is gathered into a database. Finn testified
that in 1991, she and two other DNA analysts compiled the 600 DNA
samples that are used for the CPD's population database. Since
the "product rule" is based upon the presumption that the samples
in the database are randomly gathered and therefore independent
of each other, it is necessary to validate that the samples in
the database are independent and random. Finn testified that in
order to validate the database, human population geneticists
subject the database to tests known as equilibriums. After the
CPD compiled its database, the database was given to Dr. Michael
Conneally, who is a human medical geneticist. He performed the
"Hardy-Weinberg" equilibrium test on the database to validate the
independence of its data. At trial, the following colloquy took
place:
 "Q. The Chicago database that was compiled, was that
 then statistically reviewed or analyzed by human population
 geneticists?
 A. Yes it was.
 Q. Who analyzed or reviewed that data base?
 A. Doctor Michael Keneally from Indiana University.
 Q. And do you know who Dr. Keneally is, his
 background?
 A. Yes.
 Q. Would you please tell his honor.
 MR. SINCOX [defendant's attorney]: I'm going to object. 
 Clearly they're leading up to some kind of opinion from Dr.
 Keneally. Essentially that's hearsay. I see no reason to
 go into his qualifications if you are not going to get his
 opinion ultimately. I would object to that as being
 hearsay."
The court allowed Finn to continue and reserved the option to
strike questions subject to the objection later on.
 "Q. Who is Dr. Keneally?
 A. Dr. Keneally is a human medical geneticist.
 Q. And was he given the information, the statistical
 review and analyze [sic] the Chicago database?
 A. Yes, he was given all the data from our data base.
 * * *
 Q. Did the Chicago data base meet the Hardy-Weinberg
 equilibrium?"
Defense counsel objected that Keneally's opinion was hearsay. The
court agreed that the testimony was hearsay, but allowed Finn to
testify as to Keneally's findings after concluding that the
testimony constituted a business records exception to the hearsay
rule. The court stated in pertinent part:
 "[F]or whatever it's worth, I will allow the witness to
 testify to that this [sic] is a common practice for
 validating the process and the database. So I will allow
 her to testify to that under it being basically a business
 records. This is the way this type of procedure is followed
 in order to do this and that these are the common procedures
 that people do it and go through it. I'll allow it in as a
 business practice more or less, and I will allow her to
 answer that question."
After a brief recess, the examination of Finn continued and she
was allowed to testify that the database met the Hardy-Weinberg
equilibrium test. 
 Before addressing the merits of defendant's contentions, we
must first clarify a misstatement of fact made by defendant in
his brief and at oral argument. Defendant argues that Finn
should not have been allowed to testify to matters of statistical
probability where the "sole basis of her calculations was the
work of Keneally [sic]." Furthermore, at oral argument,
defendant argued that Finn did not calculate the statistical
probabilities herself. These assertions are incorrect. Our
review of the record indicates that Finn did calculate the
probabilities, herself, and merely relied on Keneally's
conclusions as part of her analysis. 
 Defendant's arguments appear to be premised on a
misunderstanding of Keneally's role in this case. Finn did
repeat Keneally's conclusion that the CPD database met the Hardy-
Weinberg equilibrium test. In our view, Finn's testimony was not
hearsay. It was not offered for the truth of the matter
asserted. See Young Men's Christian Ass'n v. Midland Architects,
Inc., 174 Ill. App. 3d 966, 971, 529 N.E.2d 288 (1988). Rather,
Finn's testimony was properly admitted under Federal Rule of
Evidence 703. Fed.R.Evid. 703.
 This court adopted Rules 703 and 705 of the Federal Rules of
Evidence in Wilson v. Clark, 84 Ill. 2d 186, 417 N.E.2d 1322
(1981), and held that an expert witness may base his or her
opinion on information that has not been admitted into evidence
so long as that information is reliable and is of a type
reasonably relied upon by experts in that field. Rule 703 did
not, however, create an exception to the hearsay rule, City of
Chicago v. Anthony, 136 Ill. 2d 169, 185, 554 N.E.2d 1381 (1990). 
The underlying facts or data upon which an expert in a particular
field is found to have reasonably relied are not admitted for
their truth. City of Chicago, 136 Ill. 2d at 185. Rather, these
facts are admitted for the limited purpose of explaining the
basis for the expert witness' opinion. City of Chicago, 136 Ill.
2d at 185, citing People v. Anderson, 113 Ill. 2d 1, 12, 495
N.E.2d 485 (1986). Furthermore, it is for the circuit court, in
the exercise of its discretion, to determine whether the
underlying facts or data upon which an expert bases an opinion
are of a type reasonably relied upon by experts in the particular
field. City of Chicago, 136 Ill. 2d at 186. Such a
determination shall not be disturbed unless there has been an
abuse of discretion. City of Chicago, 136 Ill. 2d at 186.
 Defendant contends that in cases involving DNA probability
statistics such as People v. Lipscomb, 215 Ill. App. 3d 413, 574
N.E.2d 1345 (1991), and People v. Contreras, 246 Ill. App. 3d
502, 615 N.E.2d 1261 (1993), experts such as Keneally have always
been required to testify. Defendant misapplies these cases. In
Lipscomb, DNA testing was used to identify the defendant, who was
charged with aggravated sexual assault. Several forensic
scientists at Lifecodes, a corporation created to refine DNA
testing, testified about the DNA analysis they performed on the
blood samples. Dr. P. Michael Conneally testified and gave
statistical probabilities of the frequency of DNA matchings that
were completed by two other doctors. Lipscomb, 215 Ill. App. 3d
at 423. Defendant contends that Conneally, who testified in
Lipscomb, is probably the same Keneally who testified in the
instant case and that, therefore, since Conneally testified in
Lipscomb, he should have testified in the instant case. We
disagree. In fact, we believe that Lipscomb more aptly supports
our analysis. 
 In Lipscomb, Conneally was one of several experts who
reviewed matching DNA samples and offered probability statistics. 
Another expert, Dr. Baird, also matched DNA samples and gave an
opinion as to the probability of the matchings appearing in the
population. To reach his opinion, he relied on a final report
that contained matchings or sizings performed by two other
Lifecodes scientists, Melinda Keel and Kevin McElfresh. 215 Ill.
App. 3d at 423. The defendant argued, as the defendant in this
case similarly argues, that Dr. Baird should not have been
allowed to give an opinion that was based on a final report that
included McElfresh's sizings, because McElfresh did not testify. 
215 Ill. App. 3d at 435. The appellate court disagreed with the
defendant and found that the final report and the measurements in
it was data of the type relied upon by experts in the field and,
therefore, properly admitted under Wilson. 215 Ill. App. 3d at
435.
 Defendant also misconstrues the facts in Contreras. In
Contreras, DNA analysis was used to identify the defendant in a
violent home invasion. The State presented Thomas Wahl, a
forensic geneticist, as their DNA expert. The trial court
recognized Wahl as an expert in the field of forensic genetics
and serology. Contreras, 246 Ill. App. 3