OPINION
Appellants Anthem Insurance Company, Inc. ("AICI") and Community Insurance Company appeal the verdict rendered against them in the Licking County Court of Common Pleas. The following facts give rise to this appeal. In October 1996, the decedent in this case, Esther Dardinger, was diagnosed with terminal brain cancer. Prior to this diagnosis, Mrs. Dardinger had suffered from breast cancer and undergone a mastectomy and an experimental regimen of chemotherapy. Mrs. Dardinger commenced radiation treatments for the brain cancer. Although the treatments controlled the tumors, the treatments did not shrink them. Thereafter, Mrs. Dardinger was referred to Dr. Herbert Newton, at the Arthur James Cancer Center, at Ohio State University. Dr. Newton recommended that Mrs. Dardinger undergo a treatment called intra-arterial chemotherapy. In intra-arterial chemotherapy, a catheter is placed in an artery into the brain so that chemotherapeutic agents, in this case the drug Carboplatin, can be administered directly to the affected area of the brain. The risk associated with this type of treatment includes damage to the arteries, stroke and cardiac complications. At the time of her illness, Mrs. Dardinger was insured by Appellant Community Insurance Company, an Ohio corporation which does business under the trade name Anthem Blue Cross and Blue Shield ("Anthem"). Appellant AICI, an Indiana corporation, was also a party to the contract as a guarantor in the event that Anthem became financially unable to satisfy its obligations, under the policy of insurance, to the Dardingers. The policy of insurance specifically excluded coverage for experimental/investigative services, which were defined as follows, under the terms of the policy: Experimental/Investigative-any drug, device, equipment, facility, procedure, treatment, or supply (hereafter called service) which we, in our discretion, may determine with regard to a particular illness, disease or condition:
 • did not have governmental approval for marketing at the time when furnished for the purpose or manner rendered; or
 • is not supported by Reliable Evidence which shows that the service: — is generally recognized as being safe and effective for treating the condition in question by those practicing the appropriate medical specialty; — has a definite positive effect on health outcomes; — over time leads to improvement in health outcomes under standard conditions of medical practice outside clinical investigatory settings (i.e., the beneficial effects outweigh any harmful effects); and — is at least as effective as standard means of treatment in improving health outcomes, or is usable in appropriate clinical contexts in which standard treatment means is not employable.
Reliable Evidence includes only:
 1. Published reports and referred articles in authoritative medical and scientific literature; 2. the written investigational or research protocols and/or the written informed consent used by the treating facility or of another facility which is studying the same service; and 3. compilations, conclusions and other information which we have available which are drawn from (1) or (2) above.
We have the authority and discretion to determine all questions in connection with whether any service is Experimental/Investigative under this Certificate. Policy of Insurance at 32-33. Mrs. Dardinger began intra-arterial chemotherapy, with Dr. Newton, in April 1997. Following her second treatment in May 1997, an MRI indicated that Mrs. Dardinger was responding well to the treatment. Anthem pre-approved both of these treatments. Anthem also pre-approved Mrs. Dardinger's third treatment. However, when Mrs. Dardinger arrived for her fourth treatment, she was informed that there was a problem with the pre-certification from Anthem. Dr. Newton believed this was just a "glitch" because Anthem had pre-approved the previous three intra-arterial treatments. Mrs. Dardinger proceeded with the fourth treatment based upon Dr. Newton's belief. As a result of the denial of pre-approval for the fourth treatment, appellee understood that Ohio State University would appeal Anthem's decision. On July 7, 1997, appellee spoke with Anthem employee, Beth Jones, who confirmed that Ohio State University was appealing the denial and that there was nothing he could do but wait to see how the appeal proceeded. Because of Anthem's denial of pre-approval for the fourth treatment, Mrs. Dardinger was hesitant to proceed with the fifth treatment until the appeal concerning the fourth treatment was resolved. They thought the appeal would be resolved by the end of August 1997. In the normal course of treatment, Mrs. Dardinger should have undergone her fifth treatment in late July. The Dardingers had planned a vacation for the end of July so they decided Mrs. Dardinger would have an MRI when they returned. This MRI did not show as much improvement as the MRI after the second treatment, however, it did show that Mrs. Dardinger was responding to the treatment. Dr. Newton informed Mrs. Dardinger that she should continue with the intra-arterial chemotherapy. Also, due to Mrs. Dardinger's improved condition, Dr. Newton was able to decrease the amount of Decadron she was taking which he had prescribed to reduce the swelling in her brain caused by the tumors. Appellee contacted Tammy Kornja, an employee of the insurance brokerage firm that sold the Anthem policy to the school where appellee teaches, and inquired about the appeal. Ms. Kornja informed appellee that the appeal was successful. Appellee later learned that Ms. Kornja had received incorrect information. Thereafter, the Dardingers returned to Dr. Newton to discuss their options which were either to continue with the intra-arterial treatment despite Anthem's denial or administer the drugs intravenously. Dr. Newton did not believe the intravenous treatment would be as effective and he was concerned with the increased risks associated with intravenous administration. Thereafter, Mrs. Dardinger decided to proceed with regular intravenous treatment because Anthem would pay for this type of treatment. Mrs. Dardinger believed the intravenous treatment would keep the tumors stable while the appeal of the denial of pre-approval for the intra-arterial chemotherapy proceeded. Appellee testified that Mrs. Dardinger made this decision because she was worried about the significant cost of the treatment and her family's finances. Appellee knew that the remaining eight treatments would cost from $65,000 to $70,000, and if the treatments continued for another year, it would be an additional $70,000 to $90,000. Mrs. Dardinger received intravenous chemotherapy in mid-September 1997, which resulted in an immediate adverse reaction. Mrs. Dardinger's condition worsened and when she went to the hospital for an MRI to see how she was responding to the intravenous chemotherapy treatment, appellee was told that she was too sick to send home. Mrs. Dardinger remained in the hospital for two weeks recovering from the intravenous chemotherapy treatment. The MRI indicated that the tumors had grown as a result of the discontinuation of the intra-arterial chemotherapy treatments. Because of this adverse reaction, Mrs. Dardinger decided to continue with the intra-arterial chemotherapy. On October 31, 1997, Mrs. Dardinger went to Ohio State University for outpatient surgery to have the port inserted for her next intra-arterial treatment. Mrs. Dardinger was very ill at this point and had to be admitted into the hospital. The Dardingers had still not heard from Anthem about the appeal. Appellee was then informed that the tumors had grown too large and that nothing could be done. Mrs. Dardinger died on November 6, 1997, as a result of the pressure on her brain stem from the increased size of the tumors. On November 10, 1997, after returning home from his wife's funeral, Mr. Dardinger received a letter in the mail indicating Anthem denied the appeal on the basis that it was experimental. Appellee originally filed his complaint on March 11, 1998. On April 22, 1998, appellee filed an amended complaint and set forth the following causes of action: breach of the health insurance contract, bad faith, intentional infliction of emotion distress, and wrongful death. Appellee also demanded punitive damages. Prior to trial, appellee dismissed the wrongful death claim. The trial commenced on September 13, 1999. The trial court dismissed the intentional infliction of emotional distress claim, by directed verdict, at the conclusion of appellee's case in chief. Following deliberations, the jury found in favor of appellee awarding him $1,350 for the breach of contract claim; $2,500,000 for the bad faith claim; and $49,000,000 for punitive damages. The trial court entered judgment upon the jury's verdict on September 27, 1999. On October 11, 1999, appellants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, or, in the alternative, for a remittitur. The trial court overruled appellants' motion for post-trial relief. Appellants filed a notice of appeal on November 19, 1999. On November 30, 1999, the trial court entered a separate judgment awarding appellee $790,000 in attorney's fees. Appellants also appealed this judgment on December 8, 1999. We consolidated the two appeals on December 28, 1999. Appellants set forth the following assignments of error for our consideration:
 I. THE TRIAL COURT ERRED IN DENYING AICI'S MOTION FOR DIRECTED VERDICT.
 II. THE TRIAL COURT ERRED IN DENYING AICI'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
 III. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR A DIRECTED VERDICT ON PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT.
 IV. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND/OR FOR JNOV WITH RESPECT TO PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES.
 V. THE TRIAL COURT ERRED TO THE PREJUDICE OF BOTH DEFENDANTS IN ADMITTING HIGHLY INFLAMMATORY EVIDENCE THAT WAS IRRELEVANT AND/OR INCOMPETENT AND/OR MISLEADING.
 VI. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTIONS FOR A NEW TRIAL.
 VII. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR A NEW TRIAL IN LIGHT OF THE UNCONSTITUTIONALLY EXCESSIVE AMOUNT OF THE PUNITIVE DAMAGE AWARD.
 VIII. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR A SUBSTANTIAL REMITTITUR OF THE PUNITIVE DAMAGE AWARD.
 IX. THE TRIAL COURT ERRED IN AWARDING ATTORNEY'S FEES TO THE PLAINTIFF.
 I, II
In their First and Second Assignments of Error, appellants contend the trial court erred in denying AICI's motion for a directed verdict and motion for judgment notwithstanding the verdict. We agree. We begin our analysis by noting the applicable standard of review. The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. That is, whether the movant is entitled to judgment as a matter of law, when the evidence is construed most strongly in favor of the non-movant. Sanek v. Duracoat Corp. (1989),43 Ohio St.3d 169, 172. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and where there is substantial evidence to support his or her side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination. [Citations omitted.] Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271, 275. In support of these assignments of error, AICI contends it may not be held liable for breach of contract because it owed no contractual duty to appellee's decedent. The policy of insurance clearly provides that Community Insurance Company dba Anthem is the insurer and that "Anthem Blue Cross and Blue Shield is the trade name of Community Insurance Company." Policy of Insurance at i. The certificate page of the policy further provides that it is issued according to the terms of a group contract between appellee's employer and Community Insurance Company dba Anthem Blue Cross and Blue Shield. Id. at ii. The certificate page is signed by Dwane R. Houser as Chairman and Chief Executive Officer of the Ohio corporation. Id. The last page of the policy of insurance is entitled "Certificate of Membership And Summary of Benefits". It indicates that the policy of insurance is underwritten by AICI. Id. at 39. The certificate is signed by L. Ben Lytle as President and Chief Executive Officer of AICI Id. AICI argues that the language in the certificate is unambiguous and provides that AICI's obligation is merely that of a guarantor. Specifically, AICI refers to the second paragraph of the Certificate of Membership and Summary of Benefits. This paragraph provides: In the event that Community becomes financially unable to satisfy its obligations to provide insurance or health care benefits to you or any of your dependents that are covered under the Community contract, Associated will assume, pay and discharge Community's obligations and liabilities to you and your covered dependents under the terms and conditions of the Community contract. (Emphasis added.) Id.
Thus, AICI maintains that because Anthem never became "financially unable" to pay Mrs. Dardinger's intra-arterial chemotherapy treatments, a contractual duty never arose between AICI and the Dardingers. For this reason, at the conclusion of appellee's case, defense counsel moved for a directed verdict. Tr. Vol. IX at 61-62. In response to AICI's motion, appellee argued that: * * * the jury could find that medical policy was established in Indiana, that the Indiana corporation was applied throughout the system. The evidence establishes particularly in the latter part, in the September, October time period when the appeal was still pending, that whole appeal was handled in Indiana. You may recall the E-mails about we got to get the file to Indiana and somebody was going to drive it over and then they didn't get it there and, in fact, Dr. Schroeder, who made the final call, was an employee of the Indiana corporation. Furthermore, it is clear that the business of the Community Insurance in Cincinnati, an Indiana company, they are inextricably intertwined and ratified one another's acts. So we think there's ample evidence for the jury to find them equally liable. Id. at 81. The trial court overruled the motion for a directed verdict as to AICI. Id. at 100. Based upon our review of the record, we conclude the trial court erred when it overruled AICI's motion for a directed verdict. In order to establish his breach of contract claim against AICI, appellee had to establish that AICI breached its guarantor obligation as provided for in the Certificate of Membership and Summary of Benefits. Pursuant to the language of the certificate, AICI could breach its obligation under the policy of insurance only if it refused to pay Anthem's obligations and liabilities in the event that Anthem became financially unable to do so. Although Anthem refused to pay for Mrs. Dardinger's intra-arterial chemotherapy, the refusal was based upon the fact that the treatment was considered experimental, not that Anthem was financially unable to pay for the treatment. Thus, AICI never had a duty to pay for Mrs. Dardinger's intra-arterial chemotherapy because Anthem's refusal to pay was due to the nature of the treatment. Therefore, under the terms of the Certificate of Membership and Summary of Benefits, AICI did not breach its duty owed to the Dardingers. Accordingly, the trial court erred when it denied AICI's motion for a directed verdict. We would also note that appellee, throughout the trial, never mentioned the terms "piercing the corporate veil" or "alter ego" when referring to AICI. Instead, the defendants were merely referred to collectively, by both parties, as "Anthem." With respect to the law regarding piercing the corporate veil, the Ohio Supreme Court stated in the case of Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274, that: The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. Id. at paragraph three of the syllabus.
Because piercing the corporate veil is not a claim, but merely a remedy encompassed within a claim, appellee was not required to plead it in his complaint. See Geier v. National GG Industries, Inc. (Dec. 23, 1999), Lake App. No. 98-L-172, unreported, at 4. However, appellee was required to present the remedy to the jury, which the record indicates he did not do. The remedy also was not presented in the instructions to the jury. Nor was it addressed in the jury interrogatories. In fact, the issue was not addressed until the trial court did so in its judgment entry denying the judgment notwithstanding the verdict. The trial court concluded that "* * * Anthem Insurance Company, Inc., as a parent corporation, may be held liable under the theory that the corporate status of the subsidiary, Community Insurance Company, will be disregarded when it is so dominated and controlled that it is no more than a paper existence." Judgment Entry, Oct. 25, 1999, at 2. We conclude it was improper for the trial court to make this finding, after the conclusion of the trial, when ruling upon a post-trial motion. AICI also maintains, under this assignment of error, that without a contractual obligation, it may not be held liable for bad faith and may not be exposed to punitive damages or attorney's fees for bad faith. We agree with this argument. In the case of Motorists Mut. Ins. Co. v. Said (1992), 63 Ohio St.3d 690, overruled on other grounds by Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, the Ohio Supreme Court discussed the tort of bad faith. A bad faith claim arises "* * * as a consequence of a breach of a duty established by a particular contractual relationship." Id. at 694-695. The Court further explained that: `[A] breach of this duty will give rise to a cause of action in tort against the insurer.' [Citations omitted.] * * * The tort of bad faith is not a tortious breach of contract, for no matter how willful or malicious the breach, it is no tort to breach a contract. [Citations omitted.] * * * Rather, the tort of bad faith arises as a consequence of a breach of a duty established by a particular contractual relationship. * * * The duty may be breached only by an intentional failure by the insurer to perform under its contract with the insured. Id.
The intent necessary to establish the tort of bad faith requires that the insurer, through its actions, or inactions, intentionally refuses to satisfy the insured's claim. Motorists Mut. Ins. Co. at 699. Thus, "* * * [f]or an insurance company's decision on a claim to be made in good faith, it must be based upon knowledge of the facts and circumstances upon which liability is predicated." Id. Pursuant to the above definition of the tort of bad faith, the Court concluded that a cause of action for bad faith may arise under two circumstances. Under the first scenario, a cause of action for bad faith may arise when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is "* * * no lawful basis for the refusal coupled with actual knowledge * * *." Id. at 700. In Bullet Trucking, Inc. v. Glen Falls Ins. Co. (1992), 84 Ohio App.3d 327, the Montgomery County Court of Appeals explained that a plaintiff asserting both a breach of contract claim and a tort claim of bad faith will have to succeed on the contract claim if he or she is to succeed on the tort claim of bad faith because the plaintiff must first prove that the insurer had no lawful basis for refusing to satisfy his contract claim thereby establishing the proof necessary for the breach of contract claim. Id. at 334. "Only then can the plaintiff establish the tort claim by proving that the insurer had actual knowledge that its refusal to satisfy the contract claim was without lawful basis." Id. Under the second scenario, a plaintiff may maintain a cause of action for bad faith independent of a contract claim by establishing that the insurer intentionally failed to determine whether its refusal had a lawful basis. Id. The Montgomery Court of Appeals explained: * * * it is entirely possible that the plaintiff in this type of bad faith claim is unable to establish that the insurance company's refusal to satisfy the contract claim was unlawful, thereby negating any chance of his succeeding on a breach of contract claim, but at the same time he can nevertheless establish that the insurer intentionally failed to determine whether its refusal had a lawful basis, thereby establishing the bad faith claim. Id. In the amended complaint filed on April 22, 1998, appellee states in paragraph 22, "Defendants breached its duty to act in good faith in processing Esther Dardinger's request for benefits because its refusal to approve and pay for the brain chemotherapy was not reasonably justified." (Emphasis added.) Appellee essentially claims that Anthem had no lawful basis for refusing to satisfy Mrs. Dardinger's contract claim for intra-arterial chemotherapy. Appellee clearly does not allege in the complaint that Anthem intentionally failed to determine whether its refusal to provide coverage of Mrs. Dardinger's intra-arterial chemotherapy had a lawful basis. Since appellee's complaint sets forth the type of bad faith claim discussed above, under the first scenario, appellee could only maintain the bad faith cause of action if he first established a breach of contract. However, because AICI had no contractual obligation to Mrs. Dardinger, as it was merely a guarantor of the contract, AICI did not breach the contract and thus, could not be held liable under a bad faith claim. Accordingly, we sustain the First Assignment of Error. In doing so, we remand this matter to the trial court for a new trial as to the issue of damages against Anthem since the jury interrogatories did not separately indicate the amount of the judgment rendered against each appellant. Also, the jury's verdict, as to damages, is based upon the combined financial information of both AICI and Anthem. We do not vacate the award of compensatory damages against Anthem for breach of contract and bad faith. AICI's First Assignment of Error is sustained. AICI's Second Assignment of Error is moot based upon our disposition of AICI's First Assignment of Error.
 III
Anthem and AICI contend, in their Third Assignment of Error, that the trial court erred when it denied their motion for a directed verdict on appellee's claim for breach of contract. Since we addressed the issue of breach of contract as it pertains to AICI in the First Assignment of Error, we will address this assignment of error only as it pertains to Anthem. Anthem maintains the trial court should have granted its motion for a directed verdict because, as a matter of law, appellee could not rescind the contract by demanding return of the consideration given while, at the same time, attempting to enforce the contract by demanding damages for alleged non-performance and bad faith. Anthem also contends that the Dardingers suffered no compensatory contract damages and therefore, Anthem was entitled to a directed verdict. We disagree with these arguments. The record does not indicate that appellee sought to rescind the contract. Appellee did not plead, in the amended complaint, a cause of action for recission. Instead, appellee sought, as a measure of damages for breach of contract, the return of premiums paid. In the case of Yurchak v. Jack Boiman Constr. Co. (1981), 3 Ohio App.3d 15, the Hamilton County Court of Appeals recognized that the right to restitution from a party who has substantially failed to perform his or her part of the bargain is firmly established. Id. at 16, citing 18 Ohio Jurisprudence 3d 284, Contracts, Section 352; cf. Wilson Co. v. M. Werk Co. (1922), 104 Ohio St. 507; Union Pipe Machinery, Ltd. v. Luria Steel Trading Corp. (C.A. 6, 1955), 225 F.2d 829. The court further explained, in the Yurchak case, that: The term `restitution,' as it applies in breach of contract cases, refers only to the remedy of placing plaintiff in the position where he was before the contract was made; that is, to return him to the status quo ante (as opposed to damages, or his expectancy, which are to place him in the position he would be in if the contract were performed). Id. at 16, fn. 1.
Thus, "[w]hen a contract is breached, the innocent party may recover either his expectancy or the benefits he has conferred upon the breaching party by his performance under the contract." Id. at 16, citing 3 Restatement of Contracts 2d 208, Section 373. However, in order to obtain restitution as a measure of damages, the breach must be "substantial." A breach is "substantial" when `* * * non-performance is so material that it is held to go to the "essence"; it must be such a breach as would discharge the injured party from any further contractual duty on his own part.' Id. at 16, fn. 2, citing 5 Corbin on Contracts 561-564, Section 1104. In the case sub judice, we conclude the trial court properly denied Anthem's motion for a directed verdict because there was substantial evidence to support appellee's breach of contract claim against Anthem, upon which reasonable minds could have reached different conclusions. Anthem relies upon the "Experimental/Investigative" language contained in its policy of insurance to support its conclusion that intra-arterial chemotherapy is experimental. Although Anthem does not specifically assign as error, on appeal, the jury's finding that it breached its contract with the Dardingers, as noted above, we find sufficient evidence, in the record, to support this conclusion. Pursuant to the language contained in the policy of insurance, we conclude that Anthem cannot argue that the intra-arterial chemotherapy was experimental once it approved three treatments for Mrs. Dardinger and the treatments improved her condition. Anthem argues that there was no "reliable evidence" indicating that intra-arterial chemotherapy, with the drug Carboplatin, is a recognized method of treatment for this type of condition. Had Anthem denied Mrs. Dardinger's first treatment based upon the lack of "reliable evidence" this case would present an entirely different set of facts to be applied to the breach of contract claim against Anthem. However, once Anthem pre-approved three intra-arterial chemotherapy treatments for Mrs. Dardinger and her condition improved from these treatments, Anthem had "reliable evidence", as to this specific case, that intra-arterial chemotherapy, with Carboplatin, "is at least as effective as standard means of treatment in improving health outcomes, or is usable to appropriate clinical contexts in which standard treatment means is not employable." We further conclude the trial court properly permitted the jury to consider appellee's request for reimbursement of premiums paid as a measure of damages if the jury determined that Anthem breached the contract. Clearly, once the jury determined that Anthem breached its contract with Mrs. Dardinger, the only available measure of damages would be to refund the premiums paid during the period of the breach as Mrs. Dardinger could no longer be put in as good a position as she would have been in had the contract been performed by Anthem. We also conclude the refund of premiums paid, during the period of the breach, to be a proper measure of damages because said breach was substantial in nature. The denial of medical treatment, under a policy of health insurance, goes to the essence of the contract. Anthem's Third Assignment of Error is overruled.
 IV, VI, VII, VIII, IX
We will address Anthem's Fourth, Sixth, Seventh, Eighth and Ninth Assignments of Error simultaneously as all concern the issue of punitive damages. Anthem argues, in its Fourth Assignment of Error, that the trial court erred when it denied its motion for a directed verdict and/or for judgment notwithstanding the verdict with respect to appellee's claim for punitive damages. In the Sixth Assignment of Error, Anthem contends the trial court erred when it denied its request for a new trial because the award of punitive damages appears to have been given under the influence of passion or prejudice and is not sustained by the weight of the evidence. Anthem also argues, under this assignment of error, that the award of damages for bad faith appears to have been given under the influence of passion and prejudice. Anthem's Seventh and Eighth Assignments of Error also concern the issue of punitive damages. Anthem contends, in its Seventh Assignment of Error, that the trial court should have granted a new trial in light of the unconstitutionally excessive amount of the punitive damage award. In its Eighth Assignment of Error, Anthem maintains the trial court erred in denying its motion for a substantial remittitur of the punitive damage award. Finally, as to the issue of punitive damages, in its Ninth Assignment of Error, Anthem contends the trial court should not have awarded appellee attorney's fees because there was no basis for a punitive damage award. We will not address these assignments of error as they are moot based upon our decision to remand this matter to the trial court for a new trial on the issue of damages as it pertains to Anthem. Anthem's Fourth, Sixth, Seventh, Eighth and Ninth Assignments of Error are overruled as moot.
 V
In the Fifth Assignment of Error, Anthem contends the trial court erred when it admitted highly inflammatory evidence that was irrelevant and/or incompetent and/or misleading. We will address the issues raised in this assignment of error as we find they impact the breach of contract claim and claim for punitive damages. Prior to addressing the arguments presented by Anthem, under this assignment of error, we first address the applicable standard of review. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. It is based upon this standard that we review the arguments presented by Anthem. A. Executives' Salaries Anthem first argues that the trial court improperly permitted appellee to introduce the personal salaries of its executives. Anthem maintains this evidence was not specifically material to the merits of this action. We agree. In researching this issue, we found no cases that specifically address the admissibility of the personal salaries of a defendant's executives. Nor does Anthem cite to any case law in its brief to support this argument. However, case law, in Ohio, does indicate that in considering the amount of punitive damages to award, the jury may consider the following factors: "* * * the nature of the conduct that resulted in the injury, the amount necessary to deter future similar conduct, prior or similar acts of defendant, and the amount of compensatory damages awarded." Angus v. Ventura (Jan. 27, 1999), Medina App. No. 2740-M, unreported, at 4, citing Wightman v. Consolidated Rail Corp. (1994), 94 Ohio App.3d 389, 408, certiorari denied 529 U.S. 1012. The Angus case also explained that evidence of a defendant's net worth is relevant in determining the amount of punitive damages to award, however, the jury is not required to consider such evidence and its failure to do so is not grounds for reversal. Angus at 4, citing Wagner v. McDaniels (1984), 9 Ohio St.3d 184, paragraph two of the syllabus. The only case we found in which a plaintiff was permitted to introduce evidence of the net earnings of its shareholders was Cox v. Doctor's Associates, Inc. (1993), 245 Ill. App.3d 186. The Illinois Court of Appeals held that such evidence was admissible because the defendant was a closely held business and the shareholders were permitted to withdraw whatever salary they chose, leaving whatever net worth in the corporation they desired. Id. at 208. The Cox case is distinguishable from the case sub judice. Although the executives of Anthem could increase their compensation if insured benefit claims were reduced, the executives at Anthem did not have the power to withdraw whatever salary they chose. Accordingly, we conclude the trial court abused its discretion when it permitted the introduction of evidence concerning the exact amount of money each executive received as compensation. B. Number of Complaints Filed With the Ohio Department of Insurance Anthem next contends that it was error for the trial court to admit evidence regarding the number of complaints filed with the Ohio Department of Insurance without any evidence of the merits of those complaints and without any evidence of the relevance of those complaints to the pending action. The document at issue is titled "Complaint Comparisons" and contains, for the years 1996 to 1997, consumer complaints about health care. During that time period, Anthem had 461 complaints filed against it; 17.53 percent of the market share; and a complaint share of 29.81 percent. See Plaintiff's Exhibit 5. The trial court indicated, on the record, that it would permit the introduction of this evidence because it was an exception to the hearsay rule and was being offered to impeach the testimony of James Murphy. Vol. VIII at 67-68. James Murphy, president of Anthem from approximately 1996 to 1998, testified, at his deposition, that according to his recollection "* * * [Anthem] had a good performance in that our complaints or complaints filed by customers were not a great number. I don't recall numbers. Deposition James Murphy at 91-92. In overruling defense counsel's objection to the introduction of this evidence, the trial court did note that such evidence was "somewhat prejudicial" with regard to the number of claims versus their market share. Id. at 68. Anthem contends this evidence was inadmissible hearsay. We disagree, and find this evidence is an exception to the hearsay rule under Evid.R. 803(8) which provides: (8) Public records and reports Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.
Anthem also argues that the questioning of James Murphy about the number of complaints filed with the Ohio Department of Insurance was merely a sham used for the purpose of introducing this highly inflammatory evidence. We disagree and instead find that the trial court did not abuse its discretion when it permitted the introduction of this evidence to impeach the testimony of James Murphy. Finally, Anthem maintains this evidence should have been excluded under Evid.R. 403(A) because it was unfairly prejudicial. Evid.R. 403 provides: (A) Exclusion mandatory Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
Based upon our review of this information, we conclude the trial court properly admitted this evidence under Evid.R. 403(A) because it was not unfairly prejudicial. "Unfair prejudice results when a party reaps an unfair advantage from the capacity of the evidence to persuade by illegitimate means." State v. Ramsey (March 6, 1989), Stark App. No. 7558, unreported, at 2, citing 6 Wigmore, Evidence (3d Ed. 1940), Section 1865, p. 491. The Advisory Committee Notes to Fed.R.Evid. 403 states that "`[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." We find this information did not have the tendency to suggest a decision upon an improper basis and therefore, its probative value was not outweighed by the danger of unfair prejudice. This evidence merely established the number of complaints filed against Anthem. We agree that it is impossible to determine, from this exhibit, the basis for each complaint filed against Anthem or the validity of the complaints. However, the document warns that "[e]very complaint filed with the Ohio Department of Insurance has been counted, with no judgment as to `validity.'" Thus, the exhibit itself did not attest to the validity of these complaints. This evidence suggests no decision since the reasons for the complaints and the validity of the complaints are unknown. C. List of Dr. Newton's Patients Anthem next maintains that appellee was improperly permitted to introduce a list of Dr. Newton's patients who had allegedly undergone intra-arterial chemotherapy paid for by other insurance companies. At the time of his deposition in August 1998, Dr. Newton produced a list with the names of patients whom he had allegedly treated with intra-arterial chemotherapy. For confidentiality purposes, the patients were identified by number. Each patient's insurer was disclosed. Of the eighty-two patients identified on the list, over twenty were listed as insureds of Anthem. On September 2, 1998, the trial court conducted a hearing on pending discovery issues. Both parties requested discovery of documents relating to the patients identified on the list. The trial court stated that it could not order Dr. Newton to produce records relating to patients who were not insured by Anthem. However, the trial court suggested to the parties that they request those records from Dr. Newton. Specifically, the trial court's order states as follows: An issue has arisen with regard to Dr. Newton's previous similar procedures which Dr. Newton undertook on other patients. With regard to Anthem patients upon which Dr. Newton has performed similar procedures, Dr. Newton shall provide the names of those patients directly to the defendants' counsel, defendant shall search those records, redact the names, and provide the redacted information to counsel for the plaintiff. With regard to non-Anthem patients upon whom Dr. Newton has performed like or similar procedures, a joint request shall be made by counsel for the plaintiff and the defendant to Dr. Newton to search his files, redact patients' names and provide that information to counsel for the plaintiff and counsel for the defendant. The parties shall divide evenly whatever costs Dr. Newton charges for searching, redacting, and providing the information. Judgment Entry, Sept. 8, 1998, at 1-2. Pursuant to the trial court's order, Anthem requested the names of the twenty-plus patients, on Dr. Newton's list, who were identified as Anthem insureds. In response, Dr. Newton provided eight names. Anthem then searched its own records for documents relating to those eight alleged insureds. Following its search, Anthem concluded that only five of those eight patients were actually insured by Anthem. Dr. Newton refused the request to produce the records regarding the seventy-seven non-Anthem patients whom he had allegedly treated with intra-arterial chemotherapy. Anthem sought to exclude this evidence by filing a motion in limine and objecting to the introduction of this evidence at trial. In support of this request, Anthem argued that what other insurers do or may not do as to intra-arterial chemotherapy is irrelevant without some foundation as to the policy language, terms, conditions and circumstances under which payments were made. Second, Anthem contends that the evidence was not probative on the experimental question under the contract. Third, Anthem maintains the list was unreliable. Finally, Anthem argues that it could not test the reliability of any other information on the list because Dr. Newton and Ohio State University refused to produce even redacted information regarding the patients who were not Anthem insureds or redacted information regarding the patients whom they inaccurately identified as Anthem insureds. Anthem claims this information should have been excluded under Evid.R.401 and 403(A) as irrelevant, prejudicial and misleading to the jury. We disagree. The evidence concerning prior approvals of intra-arterial chemotherapy was relevant to rebut Anthem's argument that Dr. Newton and his nurse, Mary Ann Slivka, knew that at the time they informed the Dardingers that the denial was a "glitch", that other insurers were denying coverage for intra-arterial chemotherapy because it was experimental. As to the issue of reliability, Anthem extensively cross-examined Mary Ann Slivka concerning the list. Defense counsel obtained concessions from Ms. Slivka that she did not review the insurance policies of the other patients and that most patients had primary and not metastatic tumors. Vol. II at 109-111. Further, it is noted that the information relative to the specific patients on the list was only permitted to go to the jury once the entire policy of insurance, relative to that patient, was admitted into evidence. Also, the trial court indicated on the record, when it permitted the introduction of this evidence, that defense counsel would be given wide latitude in cross-examining Dr. Newton as to the reliability of the list. However, the record indicates that defense counsel failed to do so. D. Expert Testimony Regarding Terms of the Contract Finally, Anthem alleges that where a contract is unambiguous, it is error to allow expert testimony regarding the meaning of the contract, particularly when the testimony is proffered to contradict the plain meaning of the contract. In support of this argument, Anthem refers to the testimony of Dr. Linda Peeno. Anthem claims that Dr. Peeno testified that essentially the definition of experimental turns on the response of a particular patient and that it is the treatment of the individual patient that identifies whether a treatment is experimental or not. Anthem contends that under the terms of the policy of insurance, Mrs. Dardinger's response to the treatment did not define whether the treatment was experimental. Anthem maintains that instead, the determination as to whether intra-arterial chemotherapy is an experimental treatment must be based upon reliable evidence consisting of authoritative, medical and scientific evidence. We agree with Anthem's argument, but find that the admission of Dr. Peeno's testimony to be harmless error under Civ.R. 61. This rule provides: No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
"In short, harmless evidentiary error is not a ground for reversal or retrial." Staff Note to Evid.R. 103(A). As stated in Anthem's Third Assignment of Error, once Anthem approved three intra-arterial chemotherapy treatments for Mrs. Dardinger, it could no longer claim the treatments were experimental. Anthem's approval of the treatments either resulted in a determination that the intra-arterial treatments were not experimental or resulted in a waiver of Anthem's right to claim the exception from coverage. This is especially true when Mrs. Dardinger received positive, objective results following the treatments. Thus, under either conclusion, Anthem could no longer maintain that the intra-arterial chemotherapy treatments, with Carboplatin, were experimental as defined under the terms of the insurance policy. Therefore, Dr. Peeno's testimony explaining the term experimental, as defined in the policy of insurance, would have only been relevant had Anthem never approved one intra-arterial treatment for Mrs. Dardinger. However, Anthem's conduct of approving three intra-arterial treatments established the fact that at that time it did not consider the treatments to be experimental in Mrs. Dardinger's case. Thus, Dr. Peeno's testimony regarding the term experimental should have been excluded by the trial court. However, because the admission of this testimony did not affect Anthem's substantial rights, we find the admission of this testimony to be harmless error.
Accordingly, we sustain Anthem's Fifth Assignment of Error as it pertains to the introduction of evidence concerning the salaries of its executives. However, the remaining arguments under this assignment of error are overruled.
For the foregoing reasons, the judgment of the Court of Common Pleas, Licking County, Ohio, is hereby affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
 ________ Wise, J.
Edwards, J., concurs. Gwin, P.J., dissents.